Sara S. MEYER, Plaintiff,

v.

John J. CALLAHAN, Acting
Commissioner of Social
Security, Defendant.

No. 96–4274–CV–C–BC.

United States District Court,
W.D. Missouri,
Central Division.

Sept. 30, 1997.

Karen Kraus Bill, Columbia, MO, for Plaintiff.

Jerry Short, U.S. Attorney's Office, Kansas City, MO, for Defendant.

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LARSEN, United States Magistrate Judge.

Plaintiff Sara S. Meyer seeks review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401, et seq. and for supplemental security income benefits based on disability under Title XVI of the Act, 42 U.S.C. § 1381, et

seq. Plaintiff argues that the Administrative Law Judge ("ALJ") failed properly to evaluate plaintiff's subjective complaints and that the ALJ did not properly determine that the plaintiff was able to perform her past relevant work as a hair stylist and beauty salon owner. I find that (1) the ALJ did properly evaluate plaintiff's subjective complaints given the guidelines established and the discretion allotted in respect to such evidence, and (2) there is substantial evidence on the record as a whole to support the ALJ's conclusion that plaintiff can perform her past relevant work as a hair stylist and beauty salon owner. Therefore, plaintiff's motion for summary judgment will be denied, and defendant's motion for summary judgment will be granted.

## I. BACKGROUND

On August 16, 1993, plaintiff applied for a period of disability and disability insurance benefits, and on August 3, 1993, she protectively filed for supplemental security income alleging that she had been disabled since April 10, 1993. Plaintiff's disability stems from a history of lupus and associated symptoms, specifically joint pain and fatigue. Plaintiff's application was denied initially and upon reconsideration. On January 25, 1995, a hearing was held before an Administrative Law Judge. On July 24, 1995, the ALJ found that plaintiff was not under a disability as defined by the Act. On June 25, 1996, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under § 205. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson*

*v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir.1996); *Andler v. Chater*, 100 F.3d 1389, 1392 (8th Cir.1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir.1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987) (citing *Steadman v. Securities & Exchange Commission*, 450 U.S. 91, 99, 101 S.Ct. 999, 1006–07, 67 L.Ed.2d 69 (1981)). *See also Thompson v. Sullivan*, 928 F.2d at 277.

Substantial evidence means more than a mere scintilla. It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401, 91 S.Ct. at 1427; *Jernigan v. Sullivan*, 948 F.2d 1070, 1073 n. 5 (8th Cir.1991). However, the substantial-evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Id.; Clarke v. Bowen*, 843 F.2d 271, 272–73 (8th Cir.1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to es-

tablish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. *Griffon v. Bowen,* 856 F.2d 1150, 1153–54 (8th Cir. 1988); *McMillian v. Schweiker,* 697 F.2d 215, 220–21 (8th Cir.1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. The regulations, referred to generally as Medical–Vocations Guidelines, are codified in 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner can be summarized as follows:

1. Is the claimant working?

Yes = not disabled.

No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

No = not disabled.

Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.

No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.

Yes = go not next step where burden shifts to the Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

Yes = disabled.

No = not disabled.

### IV. THE RECORD

The record consists of the testimony of plaintiff, plaintiff's medical records, a medications list, earnings records, vocational report, work activity report, employer questionnaire, daily activities questionnaire, disability report, pain questionnaire, and a Residual Functional Capacity Assessment form.

### A. PLAINTIFF'S EMPLOYMENT HISTORY

Plaintiff's main form of employment has been that of a hair stylist. She reported having worked as an owner and stylist from 1973 to 1980, a stylist from 1980 to 1981, a stylist and assistant manager from 1981 to 1982, a stylist and co-owner from 1982 to 1984, a stylist and manager from 1984 to 1986, an assistant manager of beauty supplies from 1986 to 1989, an assistant manager of a convenience store during 1989, a full-time packer in an aluminum pan company from 1989 to 1993, and a part-time owner and hair stylist from 1990 to the time of the hearing (Tr. at 105). Plaintiff testified that she planned to continue working part time as a stylist after the hearing, and presumably she continues in that part-time employment to this day.

In her current position, plaintiff's duties include maintaining inventory of supplies, ordering supplies, cleaning the salon, styling hair, paying bills, answering the telephone, and scheduling appointments (Tr. at 106).

### B. SUMMARY OF MEDICAL RECORDS

The earliest medical report in the record, dated April 20, 1987, indicates symptoms consistent with lupus, including photosensitivity, erythematous plaques on her back, papules on her arms, neck and face (Tr. at 178). That medical report also notes that plaintiff was smoking three packs of cigarettes per day, complained of no joint aches or pains and no fatigue (Tr. at 178). Dr. West recommended that plaintiff use sun screen, avoid the sun and tanning beds, and use a Florone cream on the affected areas (Tr. at 178).

Medical records of Dr. Ogrinc indicate that on February 16, 1989, plaintiff was experiencing symptoms of joint pain, swelling, warmth, and some increased fatigue (Tr. at 184–186). She reported that in the past she had experienced hand swelling and some photosensitive rash (Tr. at 185). With the exception of evidence of hyperpigmented patches on her back, arms, and face from past flare ups, plaintiff did not suffer from other symptoms or express other complaints

during her February 1989 visit with Dr. Ogrinc (Tr. at 184–186). The notes indicate that plaintiff was at that time smoking one and one-half to two packs of cigarettes per day, and that she was taking Prozac "[presumably] to give her energy" (Tr. at 185). Dr. Ogrinc prescribed Naprosyn for joint stiffness, which plaintiff stopped taking because she believed it did not help (Tr. at 184).

At the request of Dr. Ogrinc, an antinuclear antibody test was performed to determine whether plaintiff suffered from systemic lupus (Tr. at 193). The results of that test, performed on February 20, 1989, were negative (Tr. at 193).

Plaintiff stopped taking Naprosyn for her joint stiffness sometime prior to May 31, 1990, and began taking Amitriptyline and Feldene in response to her complaints of headaches, fatigue, arthralgia, and stiffness (Tr. at 184). August 30, 1990, medical records from Dr. Ogrinc indicate that plaintiff was believed to have myofascial pain syndrome, but not systemic lupus (Tr. at 183). At that time, Dr. Ogrinc believed that plaintiff was ready to begin an exercise program and commented that plaintiff's response to therapy for myofascial pain syndrome was "encouraging" (Tr. at 183).

The consultative exam report addressed to Missouri Disability Determinations from Dr. Critchlow dated September 10, 1993, summarizes plaintiff's reported diagnosis of lupus and symptoms of pain and fatigue (Tr. at 159–164). It was noted that plaintiff had a "very poor handshake and her hands appeared to be somewhat swollen and tender" with evidence of mild swelling in the fingers (Tr. at 160). It was also reported that plaintiff had a normal station and gait and that an examination of axial and peripheral joints revealed no loss of motion (Tr. at 160, 163–164). The letter states that plaintiff continued to smoke between 1 and 2 packs of cigarettes per day, and had done so for more than 10 years (Tr. at 159, 178). The impression of Dr. Critchlow was that plaintiff's history and examination were consistent with systemic lupus erythematosus; however, he did not indicate in the letter whether he relied on any medical records to support the "history" or merely plaintiff's assertions (Tr. at 161).

Dr. Marshall supplied a letter dated January 10, 1995, at the request of plaintiff's attorney stating that plaintiff was diagnosed with systemic lupus erythematosus after a biopsy performed by Dr. Roller (Tr. at 8). However, Dr. Roller reported having no record of a patient by plaintiff's name (Tr. at 158). In addition to addressing plaintiff's inflammatory arthritis and posterior cervical myositis, Dr. Marshall's letter states that plaintiff suffers from "significant disability, tiredness, joint and muscle pain if she works more than 3–4 hours a day" (Tr. at 8).

The treatment record supplied by Dr. Marshall reflects plaintiff's treatment for inflammatory arthritis, posterior cervical myositis, and acute symptoms of upper respiratory infections and pharyngitis, and it indicates that plaintiff continued to smoke (Tr. at 173). Dr. Marshall's treatment record does not support the 3–4 hours a day work limitation (Tr. at 173). The only work restrictions listed on this report are suggestions that plaintiff take a two-week leave of absence in February 1993 to see if she is allergic to anything at work (Tr. at 173).

### C. RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

The first Residual Functional Capacity Assessment form, dated September 27, 1993, and completed by Dr. James Canter, indicates lupus as plaintiff's primary diagnosis (Tr. at 53). Plaintiff was reported to be able to occasionally lift and/or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk with normal breaks for about 6 hours in an 8–hour workday, sit for 6 hours in an–8 hour work day, and have unlimited ability to push or pull. When evaluating plaintiff's exertional limitations, Dr. Canter considered that plaintiff suffers from lupus and associated symptoms, such as pain, weakness, photosensitivity, fatigue, and swollen hands (Tr. at 54). It was noted that plaintiff had occasional difficulty in climbing and should avoid concentrated exposure of extreme heat, vibration, and direct sunlight (Tr. at 55, 57). Otherwise, no other limitations were noted

(Tr. at 53–60). In making the afore-mentioned determinations, Dr. Canter reviewed all the medical evidence available in the file which included records of Dr. William Marshall dated August 3, 1991 to October 3, 1993, and records of Dr. David Hottwick dated September 28, 1993, to November 30, 1993 (Tr. at 60).

On December 9, 1993, a second Residual Functional Capacity Assessment form was completed by Dr. Ruth Stoecker, stating the primary diagnosis as probable discord lupus with the possibility of a secondary diagnosis of inflammatory arthritis (Tr. at 75). The limitations reported in the second assessment are identical to the first with the exception of the added "limitation" of sensitivity to sunlight (Tr. at 76–79). Dr. Stoecker confirms plaintiff's discord lupus, but does not find symptoms sufficient for a diagnosis of systemic lupus (Tr. at 81).

### D. SUMMARY OF TESTIMONY

In a hearing exhibit, plaintiff described the effects of her medical condition. She stated that her condition has prevented her from working full time (Tr. at 148–155). In September 1993, she was working 15–25 hours a week as an owner-stylist at a beauty salon after she had to quit her job as a packer at Penny Plate because of the effects of the physical demands of the job (Tr. at 148–155). Plaintiff reported that she was being treated by Dr. Marshall with Voltaren and, when necessary, with injections which she also testified to at the hearing (Tr. at 33, 148). Plaintiff lives alone and reports difficulty in doing her housework, although she only receives occasional help from her mother. Plaintiff watches television, reads the newspaper, prepares her own meals, does the laundry, puts the dishes in the dishwasher, goes grocery shopping about twice a month, drives, attends church about once a month, and mows the grass with a riding lawn mower (Tr. at 148–155).

On a Daily Activities Questionnaire, plaintiff's mother stated that plaintiff's daily activities are mostly restricted by how she feels (Tr. at 119). Her mother stated that plaintiff has no difficulty caring for her personal needs, although her appearance is not as neat as it once was (Tr. at 120). Plaintiff's mother reported that plaintiff prepares her own meals, sometimes with her mother's help (Tr. at 120). She indicated that plaintiff goes shopping a couple of times a month for groceries, does "some housework just to get by", drives a car, watches television, reads newspapers and magazines, and cares for her small puppy (Tr. at 119–121). Plaintiff's mother stated that if plaintiff follows the 15–hour a week schedule, she can function near normal, and that "if she tries to increase her activity level she needs more medication for joint pain" (Tr. at 122).

Plaintiff, age 41 at the time of the hearing on January 25, 1995, testified that she graduated from high school and then completed a nine-month course in beauty school (Tr. at 26). At the time of the hearing, plaintiff was working part time as a self-employed cosmetologist (Tr. at 26–27). Plaintiff attempts to schedule her clients' appointments according to how well she feels (Tr. at 30). For example, sometimes plaintiff works from 9:00 a.m. to 12:00 noon from Tuesday through Friday, or sometimes she works from 9:00 a.m. to 10:30 a.m., goes home to rest, and then comes back to work from 1:30 p.m. until 3:00 p.m. (Tr. at 30, 40).

Plaintiff never works more than 15 hours per week or more than 3 hours at a time (Tr. at 30, 31, 34). Working more than that results in extreme fatigue and plaintiff is required to stay in bed for three to four days (Tr. at 30–31). Her current work schedule of 15 hours per week requires her to get complete bed rest during the entire weekend (Tr. at 31). In addition, plaintiff is required to lie in bed and rest each day after working up to 3 hours (Tr. at 32). When plaintiff is in bed resting, she normally watches television or reads (Tr. at 32). Plaintiff has never had to lie down at her beauty shop to rest, and she has never had to stop working with a client once she begins (Tr. at 34).

In addition to fatigue, plaintiff is plagued by muscle pain in her entire body, but especially in her neck and arms (Tr. at 32). Plaintiff's arms and thighs swell and her knees hurt (Tr. at 32, 33). Sometimes plaintiff has problems lifting even a soda can, but other times she can lift up to ten pounds (Tr.

at 35). Plaintiff attempted to take oral prescriptions to relieve the pain, but that resulted in stomach problems and the beginning of an ulcer so she now receives injections whenever needed (Tr. at 33).[1]

Plaintiff testified that she took Amitriptyline briefly for body shakes, but that made her feel "totally dopey" so she stopped (Tr. at 36). Her prescription was changed to Clorazepate which helps (Tr. at 36).

Plaintiff testified that she does not have insurance and cannot afford to go to the doctor other than when she is so bad that she cannot lift her arms, or something of that nature (Tr. at 37).

Plaintiff's appetite is not normal—sometimes she eats as though she is starving, and other times she merely sleeps through meal times (Tr. at 33). This has resulted in weight fluctuation (Tr. at 33–34). As far as how her medication has affected her weight, plaintiff testified as follows:

> I'm not sure that the medication doesn't make you gain weight because it tends to relax you which with more exercise. With more—as far as exercising, I don't get that much exercise. With this you have to be careful. You've got to be active, but not—but you have to be careful about being too active.

(Tr. at 34).

Plaintiff testified that she has no help with household chores (Tr. at 35). She testified that although she is not able to do household chores, she does indeed do them but only when her "body gets ready to do them." (Tr. at 35). Plaintiff has no trouble driving, but does not drive very far because she is "very content" once she gets home and is in bed (Tr. at 36).

Prior to the time she quit in 1993, plaintiff worked full time at Penny Plate in addition to working approximately 15 to 25 hours per week at her beauty shop (Tr. at 37–39). Plaintiff quit her job at Penny Plate on her doctor's advice (Dr. Marshall) and also as her own choice (Tr. at 38–39). When plaintiff quit Penny Plate, her health insurance terminated and she has been uninsured since then (Tr. at 39).

Plaintiff's beauty shop is located approximately 3 or 4 blocks from her residence (Tr. at 40). Plaintiff rents from her parents the building where her shop is located (Tr. at 40). When plaintiff worked alone, she paid $40 per month in rent although the fair market value was probably $100 per month (Tr. at 40). Now another stylist works in plaintiff's shop, and that stylist pays plaintiff's mother 50 percent of her gross proceeds in lieu of plaintiff paying the $40 monthly rent (Tr. at 41–44).

As manager of the shop, plaintiff orders supplies for herself and the other stylist, answers the phone, schedules appointments, and makes sure things are there for the other stylist to use (Tr. at 45).

Plaintiff testified that even if she is awarded benefits, she plans to continue working 15 hours per week in her beauty shop (Tr. at 44).

## V.  FINDINGS OF THE ALJ

The ALJ made the following findings in determining that plaintiff was not entitled to a period of disability, disability insurance benefits, or supplemental security income:

1.  The claimant, Sara S. Meyer, social security account number 492–56–0011, filed applications seeking a period of disability, disability insurance benefits, and supplemental security income under the provisions of Titles II and XVI of the Social Security Act on August 16, 1993 and August 3, 1993, respectively.

2.  The claimant met the insured status requirements of Title II of the Act on April 10, 1993, her alleged onset date of disability, and continuing through at least the date of this Decision.

3.  The claimant has engaged in work activity since April 10, 1993, which although concluded by the Social Security Administration to not constitute substantial gainful activity, nonetheless demonstrates an ability to engage in work activity.

---

1.  Those medications included Feldene, Naprosyn    and Voltaren.

4. The claimant has been reported to be diagnosed with lupus, but also inflammatory arthritis and posterior cervical myositis.

5. The claimant's medical conditions do not meet or equal those listed in Appendix 1, Subpart P, Regulations Nos. 4 and 16 of the Secretary and have not since April 10, 1993.

6. The claimant's medical conditions since April 10, 1993 have not for any 12 consecutive month period prevented her from returning to her job as a owner/stylist.

7. The claimant has retained the residual functional capacity to perform more than sedentary work, but even if she were reduced to sedentary employment, Vocational Rule 201.18 of Table No.1, Appendix 2, Subpart P, Regulations Nos. 4 and 16 direct a conclusion of disability based on her vocational profile of a "younger individual" at 39 to 41 years old with a high school education and her past work experience.

8. The claimant is not and was not at anytime on or before the date of this decision disabled as defined by the provisions of Titles II and XVI of the Social Security Act, as amended. (Tr. at 17–18).

Because the ALJ found (1) plaintiff does not suffer from a severe impairment or a combination of impairments which significantly limit her ability to do basic work activities or from an impairment of listing level severity, and (2) that plaintiff did not sustain her burden of proving that she has had medical conditions which have prevented her from returning to her past relevant work for any consecutive 12–month period, plaintiff was denied benefits first as a result of the ALJ's findings at the second step of the sequential analysis and again at the third and fourth steps.

### VI. EVALUATION OF SUBJECTIVE COMPLAINTS

█ Plaintiff contends that the ALJ failed to comply with *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984), when he "superficially" considered a few factors and found that plaintiff's ability to perform part-time work demonstrates an ability to work at a greater level.

█ Questions of fact, including the credibility of a plaintiff's subjective testimony, are primarily for the Commissioner to decide, not the courts. *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir.1987). Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. Consideration must be given to all relevant factors, including plaintiff's prior work record; observations by third parties and treating and examining physicians; plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *Polaski v. Heckler*, 739 at 1322. If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. *McClees v. Shalala*, 2 F.3d 301, 303 (8th Cir.1993); *Polaski v. Heckler*, 739 F.2d at 1322. The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. *Hall v. Chater*, 62 F.3d 220, 223 (8th Cir.1995); *Robinson v. Sullivan*, 956 F.2d 836, 839 (8th Cir.1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. *Robinson v. Sullivan*, 956 F.2d at 841.

The ALJ made express credibility determinations in his decision and set forth the inconsistencies which led to his conclusions. Pursuant to Polaski, the ALJ found plaintiff's complaints not credible because the medical evidence failed to reveal a condition which could reasonably be expected to produce the disabling pain and limitation plaintiff claimed.

1. *Medical evidence.* When evaluating plaintiff's subjective complaints, the ALJ is not required to determine whether plaintiff does experience certain symptoms of lupus, inflammatory arthritis, and associated pain and fatigue. Rather, he is required to determine the extent to which plaintiff experiences pain and fatigue and whether such symptoms warrant a determination of disability. Plaintiff claimed that she suffers from lupus; how-

ever, the ALJ noted in his decision that the medical record reflects that plaintiff sought treatment for only episodic complaints of joint pain, and that there is no evidence of ongoing, severe symptoms of fatigue. Specifically, the ALJ stated that:

> [L]ooking again at the listed impairment for systemic lupus erythematosus, the undersigned cannot find confirmation of the diagnosis of this condition, let alone severe manifestations.... Further, the other symptoms such as severe fatigue, fever, malaise, and weight loss have not been documented.... The medical evidence does not support that the claimant has been suffering ongoing severe symptoms of lupus since April 10, 1993, her alleged onset date of disability. She was treated for a six month period for inflammatory arthritis for which she received injections. However, no further treatment has been sought and no further evaluation has been conducted.... (Tr. at 15–16).

■ Although the ALJ may not reject plaintiff's subjective complaints of pain simply because there is a lack of medical evidence to support them, the absence of supporting medical evidence is one factor which may be considered in deciding the believability of plaintiff's complaints. *Wilson v. Chater*, 76 F.3d 238, 241 (8th Cir.1996); *Clark v. Chater*, 75 F.3d 414, 417 (8th Cir.1996); *McGinnis v. Chater*, 74 F.3d 873, 874 (8th Cir.1996).

■ In this case there are some inconsistencies among the reports of the physicians who assessed plaintiff's complaints and limitations. It is the ALJ's function to resolve conflicts among the various treating and examining physicians. *Bentley v. Shalala*, 52 F.3d 784, 785 (8th Cir.1995) (citing *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir.1989)). The ALJ specifically stated his reasons for discrediting Dr. Marshall's assessment, stating that it was merely conclusory because the diagnoses of other physicians were relied upon, which were not part of the record, and

the symptoms which he concluded were disabling were not substantiated even by his own records (Tr. at 15–16). Based on the credible medical evidence presented, the ALJ properly found that it did not support plaintiff's allegations of disabling pain and fatigue.

2. *Earnings record.* Plaintiff argues that the only consideration the ALJ gave to plaintiff's work record is the fact that she has continued to work 15 hours per week. She argues that because she performed two jobs simultaneously from 1989 until 1993, her prior work record entitles her subjective complaints to greater weight.

■ The determination of whether a plaintiff's earnings record supports her credibility is a proper question for the Commissioner to consider. *Benskin*, 830 F.2d at 883. However, the consideration of work history by itself does not say anything about plaintiff's impairment or its effect upon her residual functional capacity. *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir.1996). In addition, plaintiff's work schedule at the time of the hearing is to be considered as well as her prior work history. The ALJ noted that plaintiff's earnings and number of clients had increased from the time she applied for disability benefits to the time of the hearing. Therefore, even if plaintiff previously worked two jobs, her ability to increase the number of clients served and hence her income is certainly evidence that the ALJ may rely upon in determining that plaintiff is able to perform substantial gainful activity.[2]

3. *Daily Activities.* Plaintiff alleges that the ALJ did not fully consider the impact of her symptoms on her daily activities. The record reflects that plaintiff watches television, reads the newspaper, prepares her own meals, does the laundry, puts dishes in the dishwasher, goes grocery shopping, drives, attends church, and mows the grass with a riding lawn mower. In addition to serving clients as a stylist, as the manager of the beauty shop, plaintiff orders supplies for herself and the other stylist, answers the phone,

---

**2.** In addition, plaintiff testified that she quit her full-time job at Penny Plate (resulting in the loss of health insurance) partly on the advice of Dr. Marshall; however, there is nothing in the record indicating that Dr. Marshall advised plaintiff

to quit that job. Rather his records state that he suggested plaintiff take a two-week leave of absence to see if she was allergic to anything at work.

schedules appointments, and makes sure things are there for the other stylist to use. Plaintiff testified during the hearing that she does not usually drive very far because she is very content once she is home and in bed. She testified that although she is unable to do housework, she does indeed do it. Considering this record, I find that the ALJ fully considered the impact of plaintiff's symptoms on her daily activities.

4. *Medications.* Plaintiff alleges that the ALJ did not fully consider all of plaintiff's medications and their side effects. The ALJ had this to say about plaintiff's medications:

> While the claimant has reported side effects from her medications, they have not been shown to interfere with her activity level. Further, medications have been administered intramuscularly to avoid stomach upset.

Plaintiff is correct that the ALJ did not specifically address each of the subscribed medications in his opinion. Although the ALJ did not identify and individually consider each medication taken by plaintiff, the decision shows that plaintiff's medications and the respective side effects were given consideration in respect to their impact on plaintiff's activity level.

One of the factors set out in *Polaski* to which the ALJ must give full consideration is the type, dosage, effectiveness, and adverse side effects of medication. In this case, the record was developed to include information about plaintiff's medications relating to their type, dosage, effectiveness, and side effects. At the hearing, plaintiff testified about her medications and their side effects (Tr. at 33). The only side effects that plaintiff mentioned were stomach problems, and she testified that she had begun taking her medication in the form of intramuscular injections to avoid this sole side effect (Tr. at 33). Therefore, I find that the substantial evidence in the record supports the ALJ's opinion that the side effects of plaintiff's medications were not shown to interfere with her activity level.

5. *Functional Restrictions.* The ALJ addressed the lack of restrictions imposed by Dr. Marshall, plaintiff's treating physician, and gave his reason for discounting the January 10, 1995, letter from Dr. Marshall.

The medical evidence does not support that the claimant has been suffering ongoing severe symptoms of lupus since April 10, 1993, her alleged onset date of disability. She was treated for a six month period for inflammatory arthritis for which she received injections. However, no further treatment has been sought and no further evaluation has been conducted. The claimant has not been restricted by her physician from working more than part-time except in the letter generated at the request of her attorney just prior to her social security hearing.

■ Lack of any significant restrictions on plaintiff's activities by her doctors is inconsistent with her claims of disability. *Brown v. Chater,* 87 F.3d 963, 965 (8th Cir.1996) (citing *Smith v. Shalala,* 987 F.2d 1371, 1374 (8th Cir.1993)). In addition, although a treating physician's opinion is ordinarily entitled to greater weight than the opinion of a consulting physician, there are exceptions under which the treating physician's assessment may be given minimal consideration. *Ward v. Heckler,* 786 F.2d 844 (8th Cir.1986). A trier of fact may discount physicians' statements which are unsupported by medically acceptable clinical or diagnostic data. *Id.* In this case, Dr. Marshall's assessment was not supported by medical evidence; and Dr. Roller, the physician referenced in the letter as having performed a biopsy on plaintiff, reported having no record of ever having a patient by plaintiff's name (Tr. at 158).

Because (1) plaintiff's treating physician did not restrict her activities until shortly before the hearing on her social security disability application, (2) he provided the letter restricting her activities at the request of plaintiff's attorney, (3) his assessment was not supported by medical evidence, and (4) the medical test he relied upon was allegedly performed by a doctor who has never heard of plaintiff, I find that the ALJ properly considered the lack of functional restrictions in reaching his decision.

6. *Conclusion.* The ALJ conducted a proper analysis of the relevant factors in evaluating plaintiff's pain and claims of fatigue as required by *Polaski.* He properly

discredited plaintiff's subjective complaints of pain and disabling fatigue after finding them unsupported by the medical evidence and inconsistent with plaintiff's testimony regarding her ability to engage in various daily activities. He identified the inconsistencies on which he relied and explicitly discussed his reasons for finding plaintiff's allegations not credible. The ALJ's findings are supported by substantial evidence on the record as a whole; therefore, I find that the ALJ did not err in finding plaintiff's subjective complaints of pain and disabling fatigue not credible.

## VII. "CONCLUSORY DETERMINATION"

Plaintiff argues that the ALJ erred by failing to discuss specific exertional and non-exertional requirements of plaintiff's past work as a hair stylist and beauty salon owner, and that he failed expressly to document her specific residual functional capacity.

Plaintiff bears the burden of proving that her impairment prevents her from doing past relevant work. In order to meet that initial burden of proof, plaintiff must show that she has a "medically determinable impairment which precludes performance of previous work." *Johnston v. Shalala,* 42 F.3d 448, 451 (8th Cir.1994). It is only if plaintiff shows she cannot perform her past relevant work that the burden shifts to the Commissioner to show that work exists in the national economy that plaintiff can perform. *Id.*

The fourth step of the five-step sequential analysis states:

Your impairment must prevent you from doing past relevant work. *If we cannot make a determination based on your current work activity or on medical facts alone, and you have a severe impairment(s), we then review your residual functional capacity and the Physical and mental demands of the work you have done in the past.* If you can still do this kind of work we will find you are not disabled.

20 C.F.R. § 404.1520 (emphasis added)

After evaluating plaintiff's medical records in comparison with the listed impairment for systemic lupus erythematosus, including manifestations of this condition, the ALJ concluded that "there has not been established by the evidence an impairment of listing level severity" (Tr. at 15). Thus, plaintiff was found not to be disabled at the second step of the sequential analysis which in part states: "If you do not have a severe impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience." 20 C.F.R. § 404.1520.

The ALJ then considered the third step of the sequential analysis. It was determined that plaintiff's impairments did not meet or equal those listed in Appendix 1, and have not since her alleged onset of disability (Tr. at 18, finding 5).

In regard to the plaintiff's duty to fulfill her burden of proof the ALJ had this to say:

The claimant has failed to sustain her burden to prove that she has had medical conditions which have prevented her from returning to her past relevant work for any 12 consecutive months period (Tr. at 17).

Thus, the burden never shift to the Commissioner to prove that plaintiff could perform her past relevant work or other substantial gainful activity in the national economy.

After concluding that plaintiff did not have a severe impairment or an impairment listed in the regulations, the ALJ is not required to consider the next step of the sequential analysis. If the plaintiff is found disabled or not disabled during any step in the sequential process, the ALJ need not proceed further. 20 C.F.R. §§ 404.1520(a) and 404.920(a); *Nimick v. Secretary of Health and Human Services,* 887 F.2d 864, 865 (8th Cir.1989).

Based on the above, plaintiff's arguments that the ALJ improperly failed to discuss specific exertional and non-exertional requirements of plaintiff's past work as a hair stylist and beauty salon owner, and that he failed expressly to document her specific residual functional capacity are without mer-

it. After concluding that plaintiff did not have a severe impairment or an impairment listed in the regulations, the ALJ was not required to consider any further steps of the sequential analysis. The consideration of plaintiff's past relevant work would occur at the fourth step of the sequential analysis. Since there is substantial evidence to support the ALJ's finding at the third step, the ALJ was not required to proceed to the fourth step. If the record contains enough information on past work to permit a decision as to the individual's ability to return to such past work (or do other work), then the ALJ is not required to develop the plaintiff's record in detail or make specific findings as to the demands of her past relevant work in comparison with her alleged limitations. *Battles v. Sullivan,* 902 F.2d 657, 659 (8th Cir.1990).

## VIII. CONCLUSION

For the reasons above stated, I find that (1) the ALJ properly evaluated plaintiff's subjective complaints, and (2) the ALJ properly used the five-step sequential evaluation process outlined in 20 C.F.R. § 404.1520, specifically with respect to the evaluation of plaintiff's past relevant work. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. If is further

ORDERED that defendant's motion for summary judgment is granted.