**Joseph ANDERSON, Plaintiff,**

v.

**John J. CALLAHAN, Ph.D., Acting Commissioner of Social Security,[1] Defendant.**

**No. 4:96–CV–2151 CAS.**

United States District Court, E.D. Missouri, Eastern Division.

Oct. 9, 1997.

1. The Court notes there is a typographical error in the Report and Recommendation, which reflects plaintiff's year of birth as 1992. Plaintiff was born in 1962. The Report and Recommendation will be modified accordingly.

Dennis W. Fox, St. Louis, MO, for plaintiff.

Maria C. Sanchez, Office of U.S. Atty., St. Louis, MO, for defendant.

## ORDER

SHAW, District Judge.

This matter is before the Court pursuant to the Report and Recommendation of United States Magistrate Judge Thomas C. Mummert, III, filed September 26, 1997. *See* 28 U.S.C. § 636(b). Magistrate Judge Mummert recommends that the Court deny Plaintiff's Motion for Summary Judgment and grant Defendant's Motion for Summary Judgment. Neither party has filed an objection to the recommendation.

After careful review of the matter, the Court concurs with the recommendation of the Magistrate Judge.[1]

Accordingly,

1. John J. Callahan was appointed to serve as Acting Commissioner of Social Security effective March 1, 1997. Accordingly, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, John 3. Callahan is hereby substituted for Shirley S. Chater as the defendant.

**IT IS HEREBY ORDERED** that the Report and Recommendation of the United States Magistrate Judge is **sustained, adopted** and **incorporated** herein as modified. [Doc. 13]

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [Doc. 12] is **GRANTED** and Plaintiff's Motion for Summary Judgment [Doc. 9] is **DENIED.**

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

MUMMERT, United States Magistrate Judge.

This is an action under 42 U.S.C. § 505(g) for judicial review of the final decision of John J. Callahan, the Acting Commissioner of Social Security ("Commissioner"), denying Joseph Anderson's ("Plaintiff") application for disability benefits and for supplemental income benefits under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–433, 1381–1383d. Both parties have moved for summary judgment [Docs. 9, 12], and the cause was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

### Procedural History

When 31 years' old, Plaintiff applied for disability and supplemental security income benefits, alleging a disability as of February 1994 caused by pain in his left arm and shoulder. (R. at 3, 18, 59.)[2] Plaintiff's applications were denied initially and on reconsideration. (R. at 45, 58–59, 66.) Plaintiff requested a hearing, which was held on May 3, 1995, before Administrative Law Judge ("ALJ") Myron D. Mills. (R. at 23–40.) The ALJ determined that Plaintiff was not under a disability at any time on or before the date

2. References to "R." are to the administrative record filed by the Acting Commissioner with his answer.

of his decision, and denied the applications. (R. at 15.) The Appeals Council denied review, effectively adopting the decision of the ALJ. (R. at 3.) Thus, the decision of the ALJ stands as the final determination of the Acting Commissioner.

### Testimony Before the ALJ

Plaintiff was represented by counsel at the 15–minute hearing and was the only witness.

Plaintiff was born on December 28, 1992, and was 32 years' old at the time of the hearing. (R. at 26.) He testified that he is five feet six inches tall and weighs 125 pounds. (Id.) He was not married and lived his mother. (R. at 26, 38.) He dropped out of school in the ninth grade, but had no further formal or vocational education. (R. at 27, 29.) He has difficulty reading and writing. (R. at 27.) This difficulty has caused him problems in obtaining and maintaining jobs. (R. at 28.)

Plaintiff began working in 1983 but his earnings decreased substantially beginning in 1988. (R. at 29.) Plaintiff attributes the decrease to an operation on his left shoulder and the resulting problems with that arm. (Id.) He had to stop working in 1994 because of problems with his left arm. (R. at 29, 32.) He had to stop driving after his driver's license was revoked for accumulation of too many points. (R. at 36.)

While he was working, Plaintiff was employed in various jobs, e.g., washing dishes, repairing automobiles, and cleaning offices. (R. at 28, 30–31.) His last job was in a bakery. (R. at 32.) He tries to help his mother with the housework, occasionally mows the lawn, and visits with friends when they come over. (R. at 38–39.) He testified that, "There's a lot of jobs out there that I might—I mean know I can have. I don't mind working, but I don't want to mess my arm up [more] than it is now." (R. at 39.)

Plaintiff further testified that he was currently going to a doctor, and had recently gone to the emergency room at Christian Northeast Hospital one night because of the pain in his arm. (R. at 31, 37.) He was given a sling for his arm at the hospital, and

he wears it three times a week if his arm is "really hurting [him]." (R. at 37–38.) He has pain in his left arm every night and can only slightly raise it. (R. at 31, 37.)

### Medical and Other Records Before the ALJ

Plaintiff completed several forms as part of the application process. One such form was a vocational report dated September 1994, listing five different employers between July 1993 and August 1994. (R. at 89–94.) One job listed was that of taking racks to the oven. (R. at 90–93.) Also in September 1994, Plaintiff completed a work activity report. (R. at 95–98.) That portion of the report which specifies the date after which the described activity was to have occurred was left blank. (R. at 95.) Plaintiff listed one job—a temporary position from February to March 1994 cleaning offices. (Id.) A vocational report was completed for Plaintiff in December 1994, listing four employers between 1981 and July 1994. (R. at 83.) This report does not include any reference to Plaintiff's job in a bakery. (R. at 83–89.)

Plaintiff also completed a disability report the day he applied for benefits, describing his disabling condition as being his left arm and listed February 6, 1990, as the date on which his arm began bothering him. (R. at 105.) He explained that his left arm hurt him every time he picked something up, when he slept on his arm for too long, and when it was raining or cold. (Id.) He listed a doctor he saw at a clinic and noted that he saw the doctor every week. (R. at 106.) A date of "1–25–94" is listed as the date he first saw the doctor, however, and a date of "1–28–94" is listed as the date he last saw the doctor. (Id.) Plaintiff also listed Naprosyn[3] as a medication he was taking. (Id.) According to the report, he was admitted to St. Louis University Hospital for an operation on his arm on January 3, 1994, and was discharged on February 8. (R. at 107.) His doctor restricted him to lifting no more than 10 to 15 pounds. (R. at 108.) He listed fishing as his only hobby. (Id.) The interviewer noted on

---

**3.** Naprosyn is a non-steroidal anti-inflammatory drug with analgesic and antipyretic properties.

*Physician's Desk Reference* 2478 (49th ed.1995).

the form that Plaintiff appeared to have some difficulty answering questions, but no difficulty reading or writing. (R. at 112.) The interviewer also noted that Plaintiff had a "slight stuttering problem." (*Id.*)

A pain questionnaire was completed by Plaintiff a few days after he filed his applications. (R. at 117.) When asked if pain kept him from doing certain movements, Plaintiff noted that he felt pain every time he reached out. (*Id.*) Plaintiff listed two medications— Motrin, taken three times daily, and Naprosyn, taken three times daily. (*Id.*) On a pain and daily activities report questionnaire completed in December 1994, Plaintiff listed only Motrin as a medication and stated that the pain stopped for two to three hours after he took the medication. (R. at 118.) He had to stop driving because of the pain and could no longer play baseball. (R. at 119.) A notation at the end of the form explains that Plaintiff did not complete the form because he did not understand all the questions. (R. at 121.) On a supplemental disability report completed the same day, Plaintiff is described as visiting with friends twice a week for an hour and a half and occasionally cutting the grass during the summer months. (R. at 122–23.) He shopped for groceries three times a week with his mother. (R. at 123.)

Plaintiff's residual physical functional capacity was assessed in October 1994. (R. at 67–74.) He was determined to have several exertional limitations, i.e., he could occasionally lift or carry no more than 50 pounds, frequently lift not more than 25 pounds, and stand, walk, or sit about 6 hours in an 8–hour workday. (R. at 68.) His only manipulative limitation was that he could not reach in all directions with his left arm. (R. at 70.) A notation under the "symptoms" portion of the form reads, "pain was considered [a]s credible only when reaching out [and] lifting more than 50 [pounds]." (R. at 72.)

Medical records before the ALJ included a report of a general medical examination of Plaintiff performed in September 1994 and a report of an internal medicine exam of Plaintiff performed at the agency's request in January 1995.

The first report was completed after a 35–minute examination and concluded that, "the consequence of that operation [to prevent Plaintiff's left shoulder from dislocating] is pain with decreased range of motion, both of which were demonstrated on physical exam." (R. at 134.) A range of motion form listed a 110 degree abduction in Plaintiff's left shoulder, a 120 degree forward elevation of his left shoulder, and a full range of motion in external and internal rotation. (R. at 135.)

The history portion of the second report notes that Plaintiff stated that he injured his left shoulder in 1988, that the injury necessitated surgical intervention, and that the shoulder has gotten progressively worse over the years, causing an increase in pain. (R. at 127.) Plaintiff estimated his maximum lifting capacity to be 30 pounds and reported that he had difficulty with the grip strength in his left hand and was unable to reach out. (*Id.*) The musculoskeletal portion of the exam revealed the following:

> There was no focal tenderness or swelling about the left shoulder joint. He would not abduct his left shoulder beyond 30 degrees and resisted my movement of his shoulder joint. He would not externally or internally rotate this joint at all. He could fully extend the elbow, flex his elbow but could not fully extend it, lacking approximately 20 degrees. (R. at 129.)

The examining doctor noted his impression as follows:

> [Plaintiff] has had progressive worsening of [range of movement] and increased pain about the left shoulder joint with some associated paresthesia in the left arm. He was seen for examination in 8/94 and had left shoulder [range of movement] at approximately 110 degrees abduction with full abduction, full internal rotation, full external rotation and forward elevation limited to 120 degrees. He states that his shoulder has become progressively worse since then. There was evidence of decreased [range of movement] of the left shoulder and left elbow joint but with good grip, fine finger movement, finger thumb opposition bilaterally and no evidence of intrinsic muscle atrophy of the hands. (*Id.*)

The remaining medical records before the ALJ included (a) a April 1993 record from

the St. Louis Regional Medical Center of an admission for treatment of hemorrhoids (R. at 139–40); (b) a February 1995 record from Christian Hospital Northeast which lists a x-ray of Plaintiff's left shoulder and an electro-cardiogram but does not include the results of either or a diagnosis (R. at 146–47); and (c) a psychological evaluation performed at the request of the state division of vocational rehabilitation.[4] (R. at 150–154). The evaluation was done by Sherman Sklar, a licensed psychologist and comprised five tests and a clinical interview. (R. at 151.) The test results indicated that:

> [Plaintiff] is functioning in the mild mentally retarded range of intelligence with a full scale IQ of 62[5] on the WAIS–R.[6] There is little difference between his verbal IQ of 63 and his performance range of 65, both of which are in the mentally retarded range. There are no learning strengths seen in his sub-scale profile and in a generally weak effort, he got no items correct on the similarities sub-test, indicating an extreme deficiency in his abstract reasoning abilities . . .

> [Plaintiff's] display of his basic academic abilities shows him to be functionally illiterate with all of his academic achievement scores at about the second grade level. These results are congruent with the limited learning capabilities shown by his IQ scores. These cognitive test results indicate that he is best served in an on-the-job, low-skill training program. (R. at 152.)

Plaintiff's I.Q. score was noted on the "OHA Psychiatric Review Technique Form" completed by the ALJ. (R. at 16–18.) Accordingly, the ALJ rated the limitations placed on Plaintiff by his low I.Q. Two categories of functional limitations, "restriction of activities of daily living" and "difficulties in maintaining social functioning," were rated

as presenting no limitations. (R. at 17–18.) One category, "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner," was marked as "often" being a limitation. (R. at 18.) And, the final category, "episodes of deterioration or decompensation in work or work-like settings," was found to "never" present a limitation. (*Id.*)

### The ALJ's Decision

The ALJ found that Plaintiff had "residuals of a left shoulder fracture, mild mental retardation, and a history of substance abuse," but did not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P, Regulations No. 4. (R. at 14.) These impairments, the ALJ concluded, limited Plaintiff to simple work of a repetitive nature. (R. at 13.) Plaintiff was also restricted to work which did not require that he lifted more than ten pounds frequently and twenty pounds occasionally and did not require frequent reaching. (R. at 14.) Plaintiff could, however, return to his past relevant work as a baker. (*Id.*) The ALJ concluded that Plaintiff was not disabled.

Addressing Plaintiffs subjective complaints, the ALJ found them not to be fully credible, specifically finding:

> [Plaintiff's] work record is not particularly helpful on the issue of credibility. An award of benefits would be quite competitive with what he earned when he was working, as most of his earning were low. Furthermore, disability is attributed to side effects from his 1988 left shoulder dislocations. However, [Plaintiff] earned over $6,000 in 1990 and 1993 following his surgery. Those earnings represent the highest earnings ever recorded during his

---

4. Plaintiff was referred to the state division of vocational rehabilitation by his lawyer. (R. at 151.)

5. "The Social Security Administration considers a person with an I.Q. of 59 or less presumptively disabled, and a person with an I.Q. between 60 and 69 with some other physical or mental impairment imposing work-related limitations presumptively disabled. 20 C.F.R. Part 404, Subpt. P, App. 1, 12.05 B. & C." *Thomas v. Sullivan* 876 F.2d 666, 668 n. 1 (8th Cir.1989).

6. WAIS-R, the Wechsler Adult Intelligence Scale–Revised, is described in the regulations as being an acceptable standardized test for establishing mental retardation. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(D). Because verbal, performance, and full-scale I.Q.'s are provided on the WAIS, the lowest of these is used in conjunction with listing 12.05. *Id.*

work history. Although [Plaintiff] has listed multiple short term jobs, he indicates on his Vocational Report that, in addition to shoulder problems precluding the performance of some jobs, he quit some jobs because he did not like them. A poor work record and a cash income could motivate [Plaintiff] to exaggerate his symptoms. (R. at 11.)

The ALJ noted the lack of medical evidence to support Plaintiff's allegations of medical treatment or prescribed medication, and found this to be inconsistent with Plaintiff's allegations of disabling symptoms. (*Id.*) The ALJ also found Plaintiff's self-described deterioration in the movement of his left shoulder between the September 1994 and January 1995 evaluations to be indicative of exaggerated symptoms. (R. at 11–12.) The ALJ specifically noted that:

[Plaintiff] underwent a consultative examination in September 1994, due to an absence of medical records from his treating physician. He complained of constant left shoulder pain and stiffness three times per week. He reported that his activity limitations included an inability to lift greater than fifty pounds. According to the [Plaintiff], he was prescribed nonsteroidal antiinflammatory and muscle relaxant medications. Physical examination demonstrated decreased range of motion of the left shoulder.

In January 1995, [Plaintiff] was again examined at the request of the [SSA]. [Plaintiff] estimated his maximum lifting capacity at approximately thirty pounds and alleged weakness and paresthesias of the left upper extremity. Examination revealed no focal tenderness or swelling about the left shoulder. [Plaintiff] reported that his shoulder had become progressively worse since September 1994. While [Plaintiff] demonstrated full internal and external rotation in September 1994, he resisted any movement of the shoulder joint in the current examination. Compared to 110 degrees abduction on the previous examination, he would not abduct beyond 20 degrees four months later. He was able to raise his arm to 120 degrees in September 1994, but could forward elevate no more than 30 degrees in January 1995. If [Plaintiff's] symptoms had pro-gressively worsened as he alleged, it would appear that [Plaintiff] would have sought continued medical treatment. . . .

During the consultative examination in September 1994, [Plaintiff] was described as alert, oriented, and in no acute distress. Inconsistent with the results of the January 1995 examination, [Plaintiff] demonstrated the ability to raise his left arm over his head at the hearing. There are no third party observations of pain or dysfunction. (R. at 11–12.)

The ALJ further found Plaintiff's daily activities—taking out the trash, doing light housework, mowing the grass, shopping for groceries, fishing, visiting, and watching television—to be "inconsistent with an inability to work due to shoulder problems." (R. at 12.)

### *Legal Standards*

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result-ed in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The claimant bears the burden of proving he has a disabling impairment. *See Pickner v. Sullivan,* 985 F.2d 401, 403 (8th Cir.1993); *Locher v. Sullivan,* 968 F.2d 725, 727 (8th Cir. 1992).

The ALJ's decision is conclusive upon this Court if it is supported by "substantial evidence." *Onstead v. Sullivan,* 962 F.2d 803, 804 (8th Cir.1992); *Cline v. Sullivan,* 939 F.2d 560, 564 (8th Cir.1991). "Substantial evidence is that which a reasonable mind might accept as adequate to support the [Commissioner's] conclusion." *Onstead,* 962 F.2d at 804 (quoting *Whitehouse v. Sullivan,* 949 F.2d 1005, 1007 (8th Cir.1991)). Substantial evidence is also "something less than

the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Bland v. Bowen,* 861 F.2d 533, 535 (8th Cir.1988). Accordingly, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion. *See Whitehouse,* 949 F.2d at 1006; *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989). *See also Clark v. Heckler,* 733 F.2d 65, 68 (8th Cir.1984) (if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must nevertheless be affirmed if it is supported by substantial evidence).

■■■ To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider: (1) the findings of credibility made by the ALJ; (2) the education, background, work history, and age of the claimant; (3) the medical evidence given by the claimant's treating physicians; (4) the subjective complaints of pain and description of the claimant's physical activity and impairment; (5) the corroboration by third parties of the claimant's physical impairment; (6) the testimony of vocational experts based upon *proper* hypothetical questions which fairly set forth the claimant's physical impairment; and (7) the testimony of consulting physicians. *See Brand v. Secretary of Dept. of Health. Educ. and Welfare,* 623 F.2d 523, 527 (8th Cir.1980); *Cruse,* 867 F.2d at 1185. The Court is not to try the issues de novo. *See Williams v. Bowen,* 790 F.2d 713, 715 (8th Cir.1986). Weighing the evidence is a function of the ALJ, who is the fact-finder. *See Benskin v. Bowen,* 830 F.2d 878, 882 (8th Cir.1987).

The Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1520. First, the claimant cannot be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impair-

ment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ..." *Id.* If the ALJ " 'is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued." ' *Householder v. Bowen,* 861 F.2d 191, 192 n. 1 (8th Cir.1988) (quoting Social Security Ruling 85–28). Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, then the claimant is *per se* disabled. *Id.* Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The ALJ will "review [claimant's] residual functional capacity and the physical and mental demands of the work [claimant has] done in the past." *Id.* Fifth, the impairment must prevent claimant from doing any other work. 20 C.F.R. §§ 416.920(f), 404.1520(f). If claimant meets these standards, the ALJ will find the claimant to be disabled.

■■ If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts to the Commissioner to show other work that the claimant could perform in the national economy. *See Warner v. Heckler,* 722 F.2d 428, 431 (8th Cir.1983). This is a two-part burden. First, the Commissioner must prove that the claimant has the residual functional capacity to perform other kinds of work. Residual functional capacity is defined as what a claimant can do despite his limitations, see 20 C.F.R. § 404,1545(a), and includes an assessment of physical abilities and mental and other impairments. *See* 20 C.F.R. § 404.1545(b), (c), (d). The Commissioner has to prove this by substantial evidence. *See Warner,* 722 F.2d at 431. Second, once the claimant's capabilities are established, the Commissioner has the burden to demonstrate that there are jobs available in the national economy that can realistically be

performed by someone with the claimant's qualifications and capabilities. *Id.*

The Commissioner has implemented additional regulations dealing specifically with mental impairments and requiring a special procedure to be followed at each level of administrative review. *See Pratt v. Sullivan,* 956 F.2d 830, 834 (8th Cir.1992) (citing 20 C.F.R. §§ 404.1520a, 404.1520a(a)). The regulations also require that the steps of the procedure be documented at each level by completion of a standard document titled "Psychiatric Technique Review Form" (PRTF), which is essentially a checklist that tracks the requirements of the Listings of Mental Disorders. *See Id. See also* 20 C.F.R. § 404.1520a(d). At the initial and reconsideration levels, the PRTF must be completed and signed by a medical consultant. *See Montgomery v. Shalala,* 30 F.3d 98,99 (8th Cir.1994) (citing 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1)). At the hearing level, the ALJ may complete the PRTF with or without the assistance of a medical advisor. *See Id.* The PRTF must be attached to the ALJ's decision. *See Pratt,* 956 F.2d at 834.

The evaluation of a mental impairment also follows a sequential process, delineated in 20 C.F.R. § 404.1520a. *See Id.* The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists. *See Id.* (citing 20 C.F.R. §§ 404.1520a, 1520a(b)(1)) These are gleaned from a mental status exam or psychiatric history and must be established by medical evidence consisting of signs, symptoms, and laboratory findings. *See Pratt,* 956 F.2d at 835. If a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to an ability to work are present or absent. *See Id.* (citing 20 C.F.R. § 404.1520a(b)(3)). This analysis requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like setting. *See Id.* (citing 20 C.F.R. § 404.1520a(b)(3)). The first two categories are rated on a five point scale: none, slight, moderate, marked, and extreme. The third category is rated:

never, seldom, often, frequent, and constant. The fourth category is rated: never, once or twice, repeated, or continual. *See Id.* at 835 n. 10. Ratings of "none or slight" in the first and second areas, "never or seldom" in the third area, and "never" in the fourth area generally indicate that an impairment is not severe unless evidence indicates otherwise. *See Id.* (citing 20 C.F.R. § 404.1520a(c)(1)). If the claimant has a severe impairment, but the impairment neither meets or equals the listing, then the ALJ is to do a residual functional capacity assessment. *See Id.*

Pain is a valid nonexertional limitation, see *Shannon v. Chater,* 54 F.3d 484, 488 (8th Cir.1995), and "is considered disabling when it is not 'remediable and precludes a claimant from engaging in any form of substantial gainful activity,'" *Johnston v. Shalala,* 42 F.3d 448, 451 (8th Cir.1994) (quoting Cruse, 867 F.2d at 1186). Pain alone can cause physical disability, but pain is largely subjective; thus, in evaluating pain, an ALJ must rely on circumstantial evidence. *See Bentley v. Shalala,* 52 F.3d 784, 785 (8th Cir.1995) (interim citations omitted). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984) (subsequent history omitted). The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility. The ALJ must also consider the claimant's prior work record, and observations by third parties and by treating and examining doctors relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness, and side effects of any medication; and (6) the claimant's functional limitations. *See Id.*

After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ

to reject the claimant's complaints. *See Robinson v. Sullivan,* 956 F.2d 836, 839 (8th Cir.1992); *Ricketts v. Secretary of Health and Human Services,* 902 F.2d 661, 664 (8th Cir.1990); *Jeffery v. Secretary of Health and Human Services,* 849 F.2d 1129, 1132 (8th Cir.1988). Moreover, it is not enough that the record contains inconsistencies; rather, the ALJ must specifically demonstrate that he considered all the evidence. *See Id.; Butler v. Secretary of Health and Human Services,* 850 F.2d 425, 426 (8th Cir.1988). An ALJ may not discount a claimant's subjective complaints if he has failed to consider whether claimant's complaints had a psychological origin, as evidenced by medical reports in the record. *See Mellon v. Heckler,* 739 F.2d 1382, 1383 (8th Cir.1984); *Reinhart v. Secretary of Health, & Human Services,* 733 F.2d 571, 572–573 (8th Cir.1984). And, although credibility determinations are in the first instance for the ALJ and not the court, the ALJ's credibility assessment must nevertheless be based upon substantial evidence. *See Rautio v. Bowen,* 862 F.2d 176, 179 (8th Cir.1988); *Millbrook v. Heckler,* 780 F.2d 1371, 1374 (8th Cir.1985).

### Discussion

Plaintiff moves for summary judgment on the grounds (1) the ALJ erred by proceeding to step four of the sequential evaluation because his mild mental retardation combined with his illiteracy and limited use of his left arm satisfy the requirements of listing § 12.05(D),[7] and (2) the ALJ erred in deciding at step four that he could return to his past relevant work as a baker because (a) testimony by a vocational expert was necessary to assess the impact of Plaintiff's nonexertional impairment on the job base and (b) the ALJ made no inquiry into the mental or skill demands of the work. The Commissioner counters that the ALJ's decision is supported by substantial evidence on the record as a whole.

■ *Listing § 12.05.* In order to be considered disabled under Listing § 12.05(D), Plaintiff must show that he has a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.05(D) (1997). Plaintiff's I.Q. scores, unchallenged by the Commissioner, satisfy the first criterion of Listing § 12.05(D). Plaintiff argues that his illiteracy and his left arm impairment satisfy the second. The Commissioner disagrees.

■ The second criterion of § 12.05(D) is satisfied when a claimant "has a physical or additional mental impairment that has a 'more than slight or minimal' effect on his ability to perform work." *Sird v. Chater,* 105 F.3d 401, 403 (8th Cir.1997) (quoting *Cook v. Bowen,* 797 F.2d 687, 690 (8th Cir.1986)). The additional impairment need not be disabling in and of itself, but need only result in a significant *work-related* limitation of function. *See Id.* Neither Plaintiff's illiteracy nor his left arm impairment satisfy this requirement.

Illiteracy is defined in 20 C.F.R. § 404.1564(b)(1) as the "inability to read or write. [S]omeone [is] illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." "For the purpose of 'identifying a class of workers with negligible employment opportunities, the standard for literacy has been pitched quite low.'" *Starks v. Bowen,* 873 F.2d 187, 191 (8th Cir.1989) (quoting *Glenn v. Secretary of Health and Human Services,* 814 F.2d 387, 391 (7th Cir.1987)). In *Starks,* the Eighth Circuit Court of Appeals found that substantial evidence supported an ALJ's finding that a claimant was literate and not entitled to benefits. That evidence included the lack of any apparent difficulty reading or writing by the claimant during an interview; a psychologist's comment on an achievement test taken 22 years before the claimant stopped working that the claimant scored a "5th grade equivalent"; and a formal education through the tenth grade. *Id.* at 190. Evidence that detracted from the finding included the claimant's testimony that he had trouble reading lists of products and inventories and the let-

---

7. Plaintiff cites Listing § 12.05(C); however, that section has been renumbered and now is designated as § 12.05(D). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.05(D) (1997).

ters from two long-time acquaintances of the claimant that he could not read well enough to understand job applications. *Id.*

In the instant case, Plaintiff testified at the hearing that he has difficulty reading and writing, that this difficulty adversely affected a job as an auto mechanic when he was required to read a list of how to put things together, and that he would probably get help filling out an application form. The credibility of Plaintiff's testimony about his difficulty reading and writing was a question for the ALJ. *See Starks,* 873 F.2d at 190. Plaintiff was observed, however, having no problem reading or writing during the initial disability interview. He had obtained jobs and a driver's license. And, difficulty reading and writing was not given by Plaintiff as an explanation for his loss of any of the jobs he had obtained. *Cf. Battles v. Shalala,* 36 F.3d 43, 45 (8th Cir.1994) (remanding case to Commissioner in which claimant testified he was virtually illiterate; evidence was that claimant had not worked in 15 years, suffered from severe dyslexia, had borderline intellectual functioning, and had a schizotypal personality disorder). Nor did Plaintiff allege illiteracy as a disabling condition in his application for disability benefits or in his request for reconsideration. *See Sullins v. Shalala,* 25 F.3d 601, 604 (8th Cir.1994) (finding it "noteworthy" that claimant did not allege a disabling mental impairment in her application for disability benefits).

 The ALJ found that Plaintiff's claim of disabling pain when he used his left arm was not credible. As noted above, an ALJ may discredit subjective complaints of pain only if they are inconsistent with the record as a whole. *See Polaski,* 739 F.2d at 1322. Plaintiff testified that he had an operation on his left arm in 1988, and that it had gotten progressively worse. There is no record, however, of Plaintiff seeking medical treatment for his left arm until a February 1995 visit—one year after the left arm allegedly rendered Plaintiff disabled—to a hospital emergency room. The absence of ongoing medical treatment is inconsistent with subjective complaints of pain. *See Onstead,* 962 F.2d at 805. *See also Gwathney v. Chater,*

104 F.3d 1043, 1045 (8th Cir.1997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicted her subject complaints of disabling conditions); *McClees v. Shalala,* 2 F.3d 301, 302–03 (8th Cir.1993) (ALJ properly denied benefits to claimant who was seeking them for period during which claimant did not seek medical treatment, other than for a skinned elbow, and during which claimant was not taking any pain medication); *Battles v. Sullivan,* 902 F.2d 657, 659 (8th Cir.1990) (ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time). The absence of supporting medical records is particularly relevant in light of Plaintiff's testimony that he was currently going to a doctor and his disclosure on his disability application form that he was going to a clinic doctor every week and had had surgery on his left arm in January 1994.

Also absent from the record is an indication that Plaintiff was taking any pain medication. Although Plaintiff listed Naprosyn on a medication form, the only supporting documentation that Naprosyn had been prescribed was on the emergency room record. And, Plaintiff listed only Motrin, an over-the-counter medication, on another form. The lack of strong pain medication is inconsistent with subjective complaints of disabling pain. *See Richmond,* 23 F.3d at 1443–44. Plaintiff did testify that he rubs an ointment on his arm when it hurts. This remedy does not support a claim of disabling pain. *See Comstock v. Chater,* 91 F.3d 1143, 1147 (8th Cir. 1996) (claimant's use of aspirin, whirlpool, and ointment did not support claim of disabling back pain).

There is a record of Plaintiff's limited range of motion in his left arm. The ALJ found that the marked decrease in that range between September 1994 and January 1995 weakened Plaintiff's credibility rather than supporting his claims of disability. The ALJ also found that Plaintiff's work history and earnings record detracted from his complaints of disabling pain. This finding is supported by the record. *See Comstock,* 91 F.3d at 1147.[8]

---

8. The ALJ further discredited Plaintiff's subjective complaints of pain on the grounds that they were inconsistent with his record of daily activities. Although the record does not necessarily

■ *Past Relevant Work.* Plaintiff argues that even if the ALJ properly followed the sequential analysis at step three, the ALJ erred at step four when finding that Plaintiff could return to his past relevant work as a baker. This error occurred when (a) the ALJ found his short-lived job as a baker was past relevant work and (b) the ALJ failed to refer to the Dictionary of Occupational Titles ("DOT") or to elicit the testimony of a vocational expert. This argument is unavailing.

■ In determining at step four that a claimant can perform his or her past relevant work, the Commissioner may consider any work that was done in the prior 15 years that lasted long enough for the claimant to learn to do the work and that was substantial gainful activity. *See Rater v. Chater,* 73 F.3d 796, 798 (8th Cir.1996) (citing 20 C.F.R. § 404.1565(a)); *Roe v. Chater,* 92 F.3d 672, 674 (8th Cir.1996) (same); *Nimick v. Secretary of Health and Human Services,* 887 F.2d 864, 867 n. 3 (8th Cir.1989) (same). *See also Martin v. Sullivan,* 901 F.2d 650, 652 (8th Cir.1990) (citing Social Security Ruling 82–61). If an ALJ properly finds that the claimant "can perform the actual functional demands and job duties of a particular past relevant job" it is unnecessary to take notice of job information in the DOT or to elicit testimony of a vocational expert. *See Jones v. Chater,* 86 F.3d 823, 826 (8th Cir.1996); *Gaddis v. Chater,* 76 F.3d 893, 896 (8th Cir. 1996); *Evans v. Shalala,* 21 F.3d 832, 834–35 (8th Cir.1994).

Plaintiff described his previous job as a baker as lifting racks in and out of an oven. There is nothing in the record to suggest that Plaintiff could not, or did not, learn this job in the few months that he had it. Nor is there any indication in the record that Plaintiff was unable to meet the physical demands of the job. As there was no error in finding that Plaintiff could return to his past job, the ALJ was not required to take notice of the job of "baker" as defined in the DOT.

*Conclusion*

There is substantial evidence on the record as a whole to support the ALJ's conclusion that Plaintiff could return to his past relevant work. This evidence includes, most notably, the lack of any record of medical treatment sought or given for Plaintiff's left arm or mental impairment and the lack of any indication in the record that these two conditions, which predated several of Plaintiff's various jobs and two years of peak earnings, caused any work-related limitation of function. *See Orrick v. Sullivan,* 966 F.2d 368 (8th Cir.1992) (affirming denial of benefits to claimant who alleged disabling condition that predated her stopping work)

Accordingly,

**IT IS HEREBY RECOMMENDED** that Plaintiff Joseph Anderson's Motion for Summary Judgment be **DENIED.** [Doc. 9]

**IT IS FURTHER RECOMMENDED** that the Commissioner's Motion for Summary Judgment be **GRANTED.** [Doc. 12]

IT IS FURTHER RECOMMENDED that judgment be entered in favor of Defendant and against Plaintiff in this cause of action.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. *Thompson v. Nix,* 897 F.2d 356, 357 (8th Cir.1990).

---

support the ALJ's summary of Plaintiff's daily activities, the undersigned finds this discrepancy not to be fatal. Plaintiff's hearing testimony did not indicate that any restrictions on his daily activities were the result of his physical condition or mental impairment. Plaintiff listed on his application forms being unable to play baseball and to drive as restrictions caused by his impairments but testified at the hearing he could no longer drive because he had accumulated too many points.