52 F.3d 784
 47 Soc.Sec.Rep.Ser. 518, Unempl.Ins.Rep. (CCH) P 14601B
Michael BENTLEY, Appellant,
v.
Donna E. SHALALA, Secretary of Health and Human Services of
the United States, Appellee.
 No. 94-2553.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 16, 1994.
Decided April 24, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied May 30, 1995.
 
 John A. Bowman, Davenport, IA, argued (Michael DePree, on the brief), for appellant.
 Gary L. Hayward, Asst. U.S. Atty., Des Moines, IA, argued, for appellee.
 Before McMILLIAN, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.
 WOLLMAN, Circuit Judge.
 
 
 1
 In this Social Security disability case, Michael Bentley alleges he has been disabled since August 22, 1988, due to a back injury sustained on the job in April, 1988. Bentley filed for disability and supplemental security benefits on March 27, 1990, after his company disability payments ended and he was discharged. The Administrative Law Judge (ALJ) denied benefits, the Appeals Council denied review, and the district court[1] affirmed. We likewise affirm.
 
 
 2
 * The Secretary concedes that Bentley cannot return to his past work, which required substantial physical exertion. Therefore, the burden is on the Secretary to show that there are other jobs Bentley can do. E.g., Hajek v. Shalala, 30 F.3d 89, 93 (8th Cir.1994). As to Bentley's physical limitations, the ALJ found that Bentley could lift 35 pounds once or 10 pounds repeatedly; that Bentley should not sit, stand or walk for more than 30 minutes at a stretch; and that Bentley could not do repeated bending or stooping. In assessing Bentley's mental limitations, the ALJ held that Bentley would not be able to do complex work or work requiring close attention to detail, but was otherwise fit for work. Taking these limitations into account, the ALJ decided that there were numerous jobs Bentley could perform.
 
 
 3
 Bentley contends that the ALJ erred in determining his physical and mental limitations. Bentley makes essentially two arguments. First, he argues that he does not retain the physical capacity to do any work; next, Bentley argues that even if he could physically handle work, his depression, anger, and inability to take instructions or get along with coworkers render him disabled.
 
 
 4
 Bentley's argument on physical capacity centers on his claim that he cannot bend or stoop. There is some evidence for this in the record. On January 12, 1989, Dr. Scott C. McCuskey, an orthopedic specialist who has treated Bentley, wrote that Bentley could do "no heavy lifting, bending or stooping activities." On August 15, 1989, Bentley's treating physician, Dr. Paulette Lynn, stated that he should "avoid bending, stooping." More than two years later, Dr. Lynn wrote that Bentley "should not have a job where he is required to stoop, bend, or squat."
 
 
 5
 However, there also exists substantial medical evidence showing that Bentley could handle some stooping and bending. For instance, the same Dr. McCuskey on August 22, 1988 (Bentley's claimed date of disability onset) reported that Bentley's "lateral bending is good," and described his forward flexion as "a little bit tight." Dr. McCuskey made a similar notation on September 16, 1988, that Bentley "has fairly good lateral bending and he is able to forward flex well." On June 8, 1992, examining physician Dr. D.K. Mokhtar noted that Bentley "has no difficulty with occasional stooping, climbing, kneeling and crawling." Dr. Mokhtar's examination showed that Bentley could bend forward 55 degrees (with normal being 90 degrees). (Unfortunately, two residual functional capacity assessments, one on June 29, 1990, and the second on October 22, 1990, did not establish Bentley's ability to bend or stoop.)
 
 
 6
 In sum, we have one treating physician, Dr. Lynn, who has at least once stated that Bentley could neither bend nor stoop. Another treating physician, Dr. McCuskey, has made conflicting statements on Bentley's ability to bend and stoop. Examining physician Dr. Mokhtar reported some bending ability and concluded that Bentley could stoop occasionally.
 
 
 7
 It is the ALJ's function to resolve conflicts among "the various treating and examining physicians." Cabrnoch v. Bowen, 881 F.2d 561, 564 (8th Cir.1989); see Richardson v. Perales, 402 U.S. 389, 402-03, 91 S.Ct. 1420, 1427-28, 28 L.Ed.2d 842 (1971). While the opinions of treating physicians are entitled to special weight, they do not automatically control, since the record must be evaluated as a whole. Campbell v. Bowen, 800 F.2d 1247, 1250 (4th Cir.1986). Here, of course, the treating physician evidence is itself inconsistent.
 
 
 8
 We conclude that substantial evidence exists in the record supporting the ALJ's decision to reject Bentley's argument that he could not bend or stoop and is precluded from work by purely physical limitations. The most comprehensive examination of Bentley's back problems was made in May 1990, by a multi-disciplinary team at the University of Iowa's Spine Diagnostic and Treatment Center. The Center's final analysis was "that there is indeed some degenerative joint disease present, as well as a small central disc protrusion at the L5-S1 disc space. However, we are convinced at this time that [Bentley's] situation is absolutely stable ... and that [Bentley's] spine is totally solid, stable and healed from all previous injury." This is persuasive evidence that Bentley's physical limitations are based more or less exclusively on pain.
 
 
 9
 Pain alone can cause physical disability, Johnson v. Secretary of HHS, 872 F.2d 810, 812 (8th Cir.1989), but pain is largely subjective; thus, in evaluating pain, ALJs must rely on circumstantial evidence. See Polaski v. Heckler, 751 F.2d 943, 948-50 (8th Cir.1984) (subsequent history omitted). In concluding that Bentley's pain is not disabling, the ALJ here examined a host of such factors; we focus on the two that most clearly show the ALJ's decision to be based on substantial evidence.
 
 
 10
 First, the ALJ relied on the fact that the plaintiff at the time of the hearing was not taking prescription pain medicine and was not treated by doctors for a year during his claimed disability period. The absence of prescription medicine and the failure to seek medical treatment for such a long time during a claimed period of disability tends to indicate tolerable pain. See Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir.1993); Bowman v. Railroad Retirement Board, 952 F.2d 207, 210-11 (8th Cir.1991).
 
 
 11
 Second, the record shows that Bentley not only tried to return to lighter work with his former company, but also applied for jobs both related and unrelated to his previous work during his claimed disability period. Again, this record of contemplating work indicates Bentley did not view his pain as disabling. See Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir.1994) (claimant's statements that he was seeking work inconsistent with disability). (Bentley's case must of course be distinguished from situations where the medical evidence uniformly supports a finding of disability; in such cases an unsuccessful work search may even reinforce a disability claim. Walston v. Gardner, 381 F.2d 580, 586-87 (6th Cir.1967).)
 
 
 12
 These two factors, together with the inconsistent medical reports discussed above, show the ALJ's decision that Bentley was physically capable of some work is supported by the requisite substantial evidence. 42 U.S.C. Sec. 405(g).
 
 II
 
 13
 Bentley maintains that even if he does retain the physical capacity to work despite his back injury, he is disabled for mental reasons. Bentley relies for this proposition almost exclusively on the report of Dr. Grey M. Woodman, a psychiatrist selected by the ALJ to assess Bentley's mental fitness for work. Dr. Woodman assesses Bentley as "very, very angry and also depressed and at times suicidal...." Dr. Woodman notes deterioration in Bentley's ability to remember, understand and concentrate. Dr. Woodman questions Bentley's ability to get along with coworkers and supervisors, concluding that "with his physical pain, with his paranoid and angry stance, there is no way he can be employable at this stage."
 
 
 14
 At the hearing before the ALJ, Bentley cross-examined the vocational expert, using Dr. Woodman's report. When asked to assume the truth of a number of Dr. Woodman's findings, the expert stated that Bentley would not be able to work. Bentley argues that this ends the case, stating at oral argument that because the government hired Dr. Woodman, the government must "live with" any conclusions by Dr. Woodman adverse to government interests. This is wrong. Medical experts retained by the government should not act as advocates, but rather as sources of objective information. See Perales, 402 U.S. at 402-03, 91 S.Ct. at 1427-28. Dr. Woodman's report is evidence that this system can produce unbiased reports. Regardless of this, the ALJ may reject the conclusions of any medical expert, whether hired by a claimant or by the government, if inconsistent with the medical record as a whole. See Bland v. Bowen, 861 F.2d 533, 535 (8th Cir.1988) (refusing to revisit ALJ's resolution of conflicting psychological evaluations); Fulton v. Heckler, 760 F.2d 1052, 1056 (10th Cir.1985) (refusing to credit psychiatric evaluation which did not comport with claimant's medical history); Perales, 402 U.S. at 399, 91 S.Ct. at 1426.
 
 
 15
 Bentley's attack also gives short shrift to another important point: Dr. Woodman was not the only medical expert retained by the government to evaluate Bentley's mental fitness for work. Clinical psychologist Dr. Julian M. Burn, who examined Bentley only weeks before Dr. Woodman, filed a report coming to the conclusion that Bentley was mentally quite capable of work. Dr. Burn, like Dr. Woodman, noted Bentley's anger and depression. However, Dr. Burn wrote that Bentley had the memory and concentration needed for work, and further concluded that Bentley would be able to get along well with supervisors and coworkers.
 
 
 16
 Aside from the reports of Drs. Woodman and Burn, the record is virtually bare of evidence shedding light on Bentley's mental capacity for work. We are thus faced with a case in which two highly qualified mental health professionals with an equal opportunity to examine the claimant came to opposed conclusions as to his ability to work. Where the medical evidence is equally balanced, as we find it is here, the ALJ resolves the conflict. Bland, 861 F.2d at 535; cf. Fulton, 760 F.2d 1052 (accepting the mental evaluation which best comported with the medical record).
 
 
 17
 The district court's order is affirmed.
 
 
 18
 JOHN R. GIBSON, Senior Circuit Judge, dissenting.
 
 
 19
 I respectfully dissent. It is my belief that the ALJ in accepting the opinion of the clinical psychologist and rejecting that of the psychiatrist erred so as to deprive his findings of substantial support from the record as a whole. In the medical hierarchy, a psychiatrist has substantially greater training and has the primary responsibility for diagnosing and treating mental and emotional illnesses. Depression is one such serious illness for which a psychiatrist would have qualifications to prescribe medications or other needed treatments. A psychologist can report, observe and counsel, but may not prescribe medications. In the usual functioning in the medical world, a psychologist's report will be directed to a psychiatrist to aid in the psychiatrist's evaluation. This court errs in concluding that the ALJ's findings were supported by substantial evidence with respect to Bentley's depression.
 
 
 
 [1]
 The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa