**Daryl S. ISAACS, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of the Social Security Administration, Defendant.**

**No. 4:01CV581.**

United States District Court, D. Nebraska.

April 17, 2001.

Mary P. Clarkson, Broom, Johnson Law Firm, Omaha, NE, for plaintiff.

Ellyn Grant, Assistant United States Attorney, Omaha, NE, for defendant.

### MEMORANDUM AND ORDER

KOPF, Chief Judge.

This is a social security appeal.[1] The primary issue is whether the Administra-

---

1. Because Plaintiff is homeless, both the Social Security Administration and this court expedited consideration of this case.

tive Law Judge (ALJ) erred when she relied upon the opinion of a treating psychiatrist and a treating psychologist that Plaintiff was a malingerer and an alcohol and drug abuser, who did not suffer from an incapacitating mental illness. Finding no error, I affirm.

## I. BACKGROUND

To provide context, I first review the procedural history. Then I describe the supplemental evidence submitted by Plaintiff's counsel. I also describe Plaintiff's unusual request to reopen an Ohio case. After that, I summarize the facts presented to the ALJ in this case.

### A. Procedural History

This suit involves two applications made under the Social Security Act (the Act). The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 *et seq.* (Tr.[2] 154–56). The second is an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* (Tr. 616–18). Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of decisions under Title XVI to the same extent as the Commissioner's final determination under section 205.

Plaintiff's applications were denied initially (Tr. 81, 88–90, 619) and on reconsideration (Tr. 83, 94–96, 621). On September 14, 2001, following a hearing, an administrative law judge (ALJ) rendered a decision (Tr. 11–26), in which she found that Plaintiff was not under a "disability" as defined in the Social Security Act.[3] On October 17, 2001, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. (Tr. 7–9.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

The ALJ found that Plaintiff had "severe" impairments including drug and alcohol abuse, schizoaffective disorder, and antisocial personality disorder (Tr. 19), but did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. § 404, Subpart P, Appendix I, Regulations No. 4 (Tr. 19). The ALJ found that Plaintiff's impairments would not preclude him from performing his former work as a laborer. (Tr. 23–24.) Additionally, the ALJ found that Plaintiff could perform other work existing in substantial numbers in the national economy including inventory stock clerk, laundry work, janitorial work, and horticultural worker/grounds keeper. (Tr. 24.)

### B. Supplemental Evidence and Attempt to Reopen

Attached to Plaintiff's brief is "Appendix 1–'A' File." ("Appendix 1.") This information relates to a claim submitted in Ohio to the Social Security Administration wherein Plaintiff sought disability benefits. The information described in "Appendix 1" spans 1994 through 1996.

Plaintiff's counsel represents that an ALJ denied Plaintiff benefits in Ohio even though Plaintiff was not given an opportunity to testify. The matter was appealed, and the Appeals Council remanded for a further hearing. Counsel represents that a remand hearing was never held, and Plaintiff testified at the evidentiary hearing in this case that he was unaware that

---

**2.** The Transcript (Tr.) prepared and filed by the Social Security Administration is found at filing 16.

**3.** Despite repeated failures to appear, the ALJ went to extraordinary lengths to provide Plaintiff with a hearing. (Tr. 14.)

the Ohio application had been remanded. (Tr. 69.)

Plaintiff's counsel requests two things. First, counsel asks that I consider the information contained in "Appendix 1" in support of the instant application. Second, counsel requests that I reopen the Ohio case, and award benefits starting from April 31, 1994, the date of the Ohio application. Counsel represents in her brief that:

> At the last administrative hearing on September 7, 2001 [the ALJ] admitted into evidence the "A" file, which is the administrative record of evidence from the first application and hearing concerning the Plaintiff, which took place in Ohio. These exhibits were not included in the transcript prepared by [the Social Security Administration] and filed in this case on January 8, 2002.... By agreement of Ellyn Grant, counsel for Defendant, the Plaintiff has attached a photocopy of the "A" file to this Brief and marked it as Appendix 1.

Pl.'s Br. in Supp. of Pl.'s Mot. for Summ. J. at 2 n. 1.

The government has not disputed the representations made by Plaintiff's counsel. However, the government objects to any attempt to reopen the Ohio case.

The record reflects that the ALJ in this case intended to "consider everything in the A file." (Tr. 42.) Thus, although Plaintiff's counsel asserted an onset date of November, 1998 (Tr. 41–42), the ALJ, at the request of Plaintiff's counsel, apparent-ly considered evidence prior to the 1998 onset date to the extent it was considered helpful in understanding matters taking place on and after the onset date. That is, she apparently considered the "Appendix–1" information as relevant medical history.

When deciding the merits of this appeal (as opposed to the reopening question), I have considered the supplemental evidence. Leaving the question of reopening to one side for the moment, nothing in "Appendix 1" changes the outcome of this case.[4] To avoid any further confusion, I shall direct the clerk of the court to file "Appendix 1" in the court file. In that way a record will be made of what Plaintiff's counsel tendered to me.

As for the reopening request, it will be denied. The reasons for that denial are set forth later in this opinion.

## C. Factual Summary

At the time of the hearing in this matter, Plaintiff was a 39–year–old male with a high school education. (Tr. 59.) When not in prison[5], his previous jobs included landscaping (Tr. 60), roofing repairs (Tr. 61), and tow truck driver (Tr. 72). He had not engaged in substantial gainful activity since his alleged onset date of November 1998. (Tr. 41.)

The medical evidence shows that prior to his alleged onset date, Plaintiff received medical treatment for various conditions. For example, in October 1997, Plaintiff received impatient treatment at Trumbull Memorial Hospital, Warren, Ohio. (Tr.

---

**4.** For example, Cynthia M. Waggoner, Ph.D., a psychologist, stated that Plaintiff "is quite capable but projects blame & responsibility onto others. He can work but is not motivated to do so." App. 1, Ex. 26 at 15. An emergency room note indicated Plaintiff appeared at the hospital stating that "I need something to sedate my brain," and Plaintiff's "drug screen shows cocaine, cannabis and barbiturates." App. 1, Ex. 21 at 2. A psychiatrist observed that Plaintiff admitted "that he really does not have an[ ] psychiatric or physical disability." App. 1, Ex. 20 at 1. The same psychiatrist observed that "[t]his person is capable of independent living. His comprehension is quite appropriate." Appendix 1, Ex. 20 at 3.

**5.** Plaintiff testified that he had been convicted of several felonies including receiving stolen property. (Tr. 60.)

330–349.) He was admitted there on October 17, 1997, and discharged eight days later. (Tr. 331–332.) Plaintiff was diagnosed with cocaine induced mood disorder, psychosis not otherwise specified, polysubstance dependence, and personality disorder not otherwise specified with antisocial and borderline traits. (Tr. 331.) Physical examination showed no significant abnormalities. A drug screen was positive for cocaine. Plaintiff responded well to treatment, both therapy and medication, and his symptoms subsided. He was referred for counseling. (Tr. 331–332.)

Records indicated that Plaintiff received treatment from Valley Counseling Services, Inc., in Ohio intermittently from October 1997 to May 1999. (Tr. 369–397.) His diagnoses included alcohol dependence, antisocial personality disorder, cannabis dependence, and paranoid personality disorder. (Tr. 397). A treatment note dated November 14, 1997, indicated that Plaintiff was cooperative and open, but was also hostile and anxious. He was observed to be "moderately" depressed, and mildly irritable, anxious and fearful. There were no pathological behaviors or perception problems noted. (Tr. 391.) On December 1, 1997, Plaintiff reported suicidal ideation and hallucinations. (Tr. 390.) On February 25, 1998, Plaintiff indicated that he was thinking of getting a job if he was not approved for SSI benefits. His counselor noted that he appeared calm and controlled but slightly hostile and anxious at times. (Tr. 386.) On May 15, 1998, Plaintiff reported that he had "dropped" his social security claim, and that he had been riding his bicycle while drinking and had hit a truck. (Tr. 384–385, see also 446.) On May 19, 1998, Plaintiff reported that he planned to start working the next week and had been working for one month. (Tr. 384.) Plaintiff indicated that he would rather self medicate than take prescribed medications. He was observed to be only mildly de-

pressed, and not irritable, anxious or fearful. Pathological and perceptual problems were absent, as were suicidal and homicidal thoughts. (Tr. 384.)

On March 18, 1999, Plaintiff reported to Dale Bryant, M.S.Ed., of Valley Counseling Services that he was "very depressed," had nowhere to go, and requested hospitalization. (Tr. 374–381.) Mr. Bryant did not believe that Plaintiff was at risk to harm himself or others, but did indicate that Plaintiff exhibited a mood disturbance which was moderate to severe. (Tr. 375.) Plaintiff was not then taking medication. Plaintiff reported that he had drunk two beers, but would not state how often he drank. Plaintiff also reported that he had stolen and used cocaine the previous day. (Tr. 377.) Plaintiff was observed to be cooperative, and not hostile or anxious. He exhibited a full range of affect of emotion, moderate depression, and severe irritability. Plaintiff was oriented, alert, and attentive. (Tr. 378.) No pathological processes were observed. Plaintiff reported auditory hallucinations, but Mr. Bryant considered these might be Plaintiff's own thoughts. (Tr. 379.) Plaintiff was diagnosed with alcohol dependence, adjustment disorder with depressed mood, cocaine abuse, antisocial personality disorder, and paranoid personality disorder, with a Global Assessment of Functioning ("GAF") score of 45. (Tr. 380.)

Also on March 18, 1999, Plaintiff was admitted to the Riverbend Treatment Center in Youngstown, Ohio, due to allegations of suicidal thoughts and auditory hallucinations. (Tr. 362–363.) Although initially hostile, Plaintiff complied with meals and medications. Plaintiff did not want to leave when he was discharged, refused housing options which were offered to him, and was not receptive to aftercare programs. (Tr. 363.) Plaintiff was discharged on March 25, 1999, with diagnoses

including alcohol dependence, cocaine dependence, antisocial personality disorder, paranoid personality disorder, and a GAF of 45. (Tr. 362.)

Plaintiff was admitted to the Douglas County Hospital in Omaha on March 30, 2000, with complaints of depression and suicidal and homicidal ideation. (Tr. 412–416.) He presented with angry affect and irritability during his hospitalization. A drug screen was positive for cocaine. Although Plaintiff reported that he heard voices, Sidney A. Kauzlarich, M.D., opined that he appeared to have intrusive thoughts rather than auditory hallucinations. (Tr. 398.) Dr. Kauzlarich noted that Plaintiff did not show any signs of a depressive disorder or a psychotic disorder. Plaintiff was evaluated and observed until April 4, 2000, exhibiting essentially no signs of depression or psychosis. (Tr. 398.)

On April 4, 2000, Plaintiff admitted that he was malingering for food and shelter, and requested discharge. (Tr. 398.) He was discharged on an antidepressant and Dr. Kauzlarich opined that Plaintiff did not appear to be in imminent danger to himself or others. (Tr. 398.) He further opined that Plaintiff's prognosis was "poor" due to malingering and a likelihood that Plaintiff would have poor follow-through. (Tr. 399.)

According to Dr. Kauzlarich, Plaintiff's "Axis I" discharge diagnosis was "Most likely malingering for secondary gains including food and shelter and disability," "Rule out depressive disorder, NOS" and "Cocaine abuse." (Tr. 398.) His "Axis II" diagnosis was "Probable antisocial personality disorder." (Tr. 398.) His "GAF" score at discharge was approximately 65 to 70. (Tr. 398.)

On April 4, 2000, while at the Douglas County Hospital, the Minnesota Multiphasic Personality Inventory–II (MMPI–II) was administered to Plaintiff by Michael Gillaspie, Ph.D., a Licensed Clinical Psychologist. (Tr. 410.) The results were invalid due to "gross over-endorsement of symptoms, problems and unusual responses." Indeed, Plaintiff's score on the "lie" scale was "4 standard deviations above the mean." (Tr. 410.) Confusion was ruled out as a contributing factor. Dr. Gillaspie stated that: "It would appear that Mr. Isaacs is exaggerating symptoms either intentionally for secondary gain or as a plea for help." (Tr. 410.) Dr. Gillaspie's diagnostic impressions were blunt; that is, "antisocial characteristics with a history of alcohol abuse (current use denied)." (Tr. 411.) The doctor concluded that the "[t]est results were *not* consistent with psychosis and history is equivocal for same." (Tr. 411 (emphasis added).)

Plaintiff was again admitted to a hospital, Immanuel Medical Center in Omaha, on July 5, 2000, after threatening to kill a clerk at the temporary agency where he worked. (Tr. 452–458.) He responded to medication therapy and was discharged on July 13, 2000, to Norfolk Regional Center. His diagnoses included psychotic disorder not otherwise specified, and antisocial personality disorder. (Tr. 452.)

Plaintiff was admitted to Norfolk Regional Center on July 13, 2000, and discharged seven (7) weeks later on September 1, 2000. (Tr. 464–531.) His discharge diagnoses included intermittent explosive disorder, dysthymia, cannabis dependence, alcohol dependence, cocaine abuse, nicotine dependence, antisocial personality disorder, schizotypal personality disorder, and a GAF score of 50. (Tr. 464.) He did well during his stay and did not exhibit any explosive impulses. He became less depressed and less impulsive. By July 31, 2000, Plaintiff indicated that his depression was gone. (Tr. 467.) Duane Sherman, M.D., Plaintiff's treating psychiatrist throughout his stay, opined that Plaintiff's

course in the hospital was "good," but that his prognosis was "guarded." (Tr. 468.) He did state, however, that Plaintiff had "no limitations." (Tr. 468.)

In a letter to Plaintiff's attorney dated March 17, 2001, Robert Dale Jones, M.D., indicated that he had seen Plaintiff on seven occasions over the previous six months. (Tr. 575–576.) He opined that Plaintiff's use of cocaine was at an addiction level. Dr. Jones stated that Plaintiff's mental status had been "extremely variable," varying from being "extremely disturbed and paranoid to being rather quiet and subdued." He alleged that when Plaintiff was disturbed he had been "clearly delusional" and threatening. Dr. Jones believed that Plaintiff had taken his medications "religiously." He opined that Plaintiff was "seriously mentally ill and that this illness had and will continue to be so disabling that he will not be able to maintain employment." (Tr. 575.) He diagnosed Plaintiff with schizoaffective disorder, which Dr. Jones defined as a cross between manic-depressive disorder and schizophrenia. (Tr. 576.)

On July 30, 2001, Dr. Kauzlarich, Staff Psychiatrist at Douglas County Hospital, performed a psychiatric evaluation on Plaintiff. (Tr. 586–89.) Dr. Kauzlarich observed that Plaintiff presented himself in a very similar fashion as a year prior with a "very negative attitude, very anti-society attitude and perspective." (Tr. 586.) Dr. Kauzlarich indicated that Plaintiff's mood was euthymic [6], his sensorium was clear, and his cognition was intact with no signs of impairment. He noted that Plaintiff's insight into his antisocial traits, and his distortions about society were limited and that his judgment was poor as a result. (Tr. 588.) Upon discharge, the doctor observed that Plaintiff "definitely appeared to be responsible for his behav-

iors and capable of controlling his anger when confronted." (Tr. 589.) This was consistent with the doctor's observation a year earlier; that is, Plaintiff suffered from an "antisocial personality disorder" but "no real major mental illness." (Tr. 589.)

Dr. Kauzlarich's assessment included a history of intermittent explosive disorder which was not confirmed, probable alcohol and cocaine abuse versus dependence, antisocial personality disorder, and a GAF score of approximately 55 to 60. Dr. Kauzlarich recommended routine lab work to check medication compliance as well as a drug screen. Plaintiff indicated this would likely be positive for alcohol and cocaine. (Tr. 589.)

Plaintiff appeared and testified at the administrative hearing held on September 7, 2001. (Tr. 39–79.) He testified that he could not hold a job longer than nine months because he got mad. (Tr. 59–60.) He testified that he had a problem with authority figures which made it difficult for him to get along with supervisors. (Tr. 70.)

Plaintiff testified that he had not used drugs or alcohol in the last month. He stated that he used alcohol from March to July when he was living on the street. (Tr. 63.) He drank beer as an escape. (Tr. 66.) He alleged that when he started taking his medications again the previous July, he noticed that his anger was not quite as bad and that his depression "kind of" went away, but that he felt that he was "in a fog." (Tr. 67.)

Dr. Jones, a psychiatrist, also appeared and testified at the hearing. (Tr. 44–58.) Dr. Jones testified that he retired in 1995, but had spent one day a week since then visiting shelters. (Tr. 44.) He stated that

---

6. This meant that Plaintiff's mood was moderate. *Stedman's Medical Dictionary,* at 627 (27th Ed.2000) (defining "euthymia" and "euthymic")

he first met Plaintiff in September 2000, and saw him through March 2001. (Tr. 45.) He saw Plaintiff again in July 2001. Plaintiff had stopped taking his medication and his attorney asked that Dr. Jones get him back on them. (Tr. 46.)

Dr. Jones testified that in July 2001, Plaintiff was "quite depressed," but reported to Dr. Jones that he had not used street drugs. Plaintiff told Dr. Jones that he had drunk some beer. (Tr. 46.) Dr. Jones estimated that Plaintiff had lost 40 pounds. (Tr. 46.) Dr. Jones believed that Plaintiff was not drinking or using drugs at the time of the hearing. (Tr. 47.) Dr. Jones testified that when Plaintiff was in the Siena Francis House, Dr. Jones believed that he was not using drugs or alcohol although Plaintiff's condition "varied a great deal." He further believed that Plaintiff was taking the appropriate medication during that period. Dr. Jones opined that Plaintiff was not able to function in a work situation, even when he was not drinking or using street drugs. (Tr. 49, 52.) He based this opinion on Plaintiff's behavior, stating that Plaintiff was inappropriate at times, did not do well in groups, and became threatening. (Tr. 49.)

Dr. Jones stated that Plaintiff's diagnosis was schizoaffective disorder which he described as "sort of a half way between a bipolar disorder or manic depressive disorder and schizophrenia." (Tr. 49.) He said that the intermittent explosive disorder was part of the schizoaffective disorder, where Plaintiff would experience wide mood swings and extreme irritability. (Tr. 50.) Dr. Jones opined that Plaintiff's ability to manage his activities of daily living was markedly impaired, as was his ability to interact socially. (Tr. 53.) Dr. Jones opined that if Plaintiff was compliant with medication, his condition would improve, but he would not be without symptoms. (Tr. 54–55.)

A vocational expert appeared and testified at the hearing. (Tr. 71, 74–78.) In response to a hypothetical question posed by the ALJ, the vocational expert testified that a person with the limitations the ALJ described could perform Plaintiff's past relevant work as a laborer. (Tr. 75.) In response to a second hypothetical question, the vocational expert testified that such an individual could also perform other work existing in significant numbers in the national economy, including inventory stock clerk, laundry worker, and janitorial positions. (Tr. 76–77.)

## II. DISCUSSION

Plaintiff's attack on the ALJ's decision is based upon five arguments. I will consider each separately. I will then consider the question of reopening.

### A. The Merits

■ First, Plaintiff attacks the decision for relying upon the opinion of Dr. Kauzlarich rather than relying upon the opinion of Dr. Jones. (Tr. 23.) Both doctors were treating doctors.

Essentially, Kauzlarich believed that Plaintiff was a malingerer and a drug and alcohol abuser, who did not have a major mental illness. Kauzlarich treated Plaintiff when he was hospitalized in the Douglas County Hospital. Significantly, he also evaluated Plaintiff a year later and only a few months before the hearing.

In addition to his own treatment and observations of Plaintiff, Dr. Kauzlarich's opinion was strongly supported by psychological testing. Dr. Michael Gillaspie, Ph. D., a licensed clinical psychologist at the Douglas County Hospital, tested Plaintiff using objective testing methods. He stated that Plaintiff appeared to greatly exaggerate (4 standard deviations above the mean) his claim of mental illness. He concluded that the results of objective test-

ing were not consistent with Plaintiff's claim of psychosis.

According to the ALJ, she gave "[m]ore weight . . . to the opinions expressed by Dr. Kauzlarich because of his significant treating relationship with the claimant." (Tr. 23.) This was not error. Simply put, the ALJ was free to choose the opinion of one treating physician over another because there was substantial treating-source medical evidence in the record to support the choice the ALJ made. *See, e.g., Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir.2002) (although one treating psychologist was of the opinion that Plaintiff's disorders, other than alcoholism, rendered her totally disabled, it was not error to credit the views of other treating and consulting medical personnel that she was not disabled; "It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.' ") (quoting *Bentley v. Shalala,* 52 F.3d 784, 785–87 (8th Cir.1995)); *Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir.2000) (ALJ did not err when he discounted the reliability of the opinion of a treating physician when that opinion was contradicted by the opinions of other physicians, including another treating physician); *Rogers v. Chater,* 118 F.3d 600, 602 (8th Cir.1997) (ALJ did not err when he credited "treating specialists" over "treating physician"); *Pena v. Chater,* 76 F.3d 906, 908 (8th Cir.1996) (ALJ did not err when discounting opinion of treating physician when that opinion conflicted with the opinion of another treating physician and a physical therapist who had treated Plaintiff).

■ Second, although quite vague as to the legal basis, Plaintiff claims that the ALJ erred by not securing the appoint-

ment of an independent medical expert. There was no error where, as here, there is substantial medical evidence in the record, in fact treating source medical evidence, which strongly supports the ALJ's decision. *See, e.g., Haley v. Massanari,* 258 F.3d 742, 749–50 (8th Cir.2001) (where the evidence contained substantial evidence, including treating source opinions, to support the ALJ's decision, it was not necessary to order consultative medical examination); *Anderson v. Shalala,* 51 F.3d 777, 779 (8th Cir.1995) (" '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision' ") (quoting *Naber v. Shalala,* 22 F.3d 186, 189 (8th Cir.1994)). Accordingly, the ALJ did not err by failing to secure the appointment of an independent medical expert.

■ Third, Plaintiff argues that the ALJ did not follow the required analysis when she determined that the alcohol and drug abuse was a "material factor" in Plaintiff's disability. The ALJ found that "the claimant's poly-substance abuse is a contributing factor material to the determination of the claimant's disability." (Tr. 25.) The ALJ also decided that "[i]f the claimant stopped his drug and alcohol abuse his remaining impairments would be severe but not meet or equal the criteria of any of the impairments" in the Listing of Impairments. (Tr. 22–23.)

When making this decision, the ALJ applied the Contract with America Advancement Act of 1996 (CAAA), codified at 42 U.S.C. § 423(d)(2)(C)[7] to this case. Section 423(d)(2)(C) provides that an indi-

---

7. Section 423(d)(2)(C) applies to applications for disability benefits. An identical provision, 42 U.S.C. § 1382c(a)(3)(J), applies to SSI applications. *See also* Technical Amendments Relating to Drug Addicts and Alcoholics, Bal- anced Budget Act of 1997, Pub.L. No. 105–33, §§ 5525, 5528, 111 Stat. 251, 624–25 (clarifying that the CAAA amendments apply retroactively to all non-final cases).

vidual shall not be considered disabled for Social Security purposes "if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." The regulations implementing § 423(d)(2)(C) are found at 20 C.F.R. § 404.1535.[8]

Section 404.1535(a) provides that if the Commissioner finds that the claimant is disabled and has medical evidence of the claimant's drug addiction or alcoholism, the Commissioner "must determine whether ... drug addiction or alcoholism is a contributing factor material to the determination of disability." Section 404.1535(b) explains that the "key factor" in determining whether drug addiction or alcoholism is a contributing factor material to a determination of disability is whether the claimant would still be found disabled if he or she stopped using drugs or alcohol. See 20 C.F.R. § 404.1535(b)(1).

Counsel for Plaintiff argues that the ALJ failed to follow three examples given by the Social Security Administration about how one might go about addressing this issue. The simple answer to Plaintiff's argument is that the publication[9] upon which Plaintiff relies explicitly provides only examples which are obviously not intended to be exclusive.

More importantly, the record contains substantial evidence supporting the ALJ's decision that, but for Plaintiff's drug and alcohol abuse, he would not suffer disabling mental problems. For instance, in July of 2001, he admitted that his lab results would likely come back positive for cocaine and alcohol. (Tr. 589.) But, when he stopped drinking and abusing drugs while in the Norfolk Regional Center from July 13, 2000, to September 1, 2000, Plaintiff's "course in the hospital was good," and he was discharged with "no limitations" so he could receive drug and alcohol counseling at a residential treatment facility. (Tr. 468.)

In short, Plaintiff had the burden of proof on this issue, and there is substantial evidence in the record which supports the ALJ's adverse conclusion. See, e.g., Estes, 275 F.3d at 725 (Plaintiff "carries the burden of proving her substance abuse is not a contributing factor material to the claimed disability," and evidence of applicant's alcohol abuse supported the denial of benefits). As a result, I remain unpersuaded by Plaintiff's third argument.

Fourth, Plaintiff argues that the ALJ erred because there was substantial evidence that Plaintiff's mental illness met the Listing of Impairments for schizophrenia, affective disorders, and personality disorders. This fourth argument is nothing more than a restatement of Plaintiff's disagreement with the ALJ's decision to credit the testimony of the treating experts from the Douglas County Hospital that Plaintiff suffered from no disabling mental illness. I therefore reject this argument.

Fifth, Plaintiff attacks the questions put to the vocational expert. Suffice it to state that the questions (Tr. 75–77) fairly described Plaintiff's limitations as found by the ALJ.[10] Since the ALJ's findings about

---

8. As with the statutory provisions, two identical sets of regulations have been enacted. Section 404.1535 applies only to applications for disability benefits. The regulations for SSI applications are found at 20 C.F.R. § 416.935.

9. Attached to Plaintiff's brief is a document referred to as "POMS on DAA" taken from

Volume 18, Number 9, Social Security Forum, (September 1996).

10. For example, the ALJ asked the vocational expert to assume that Plaintiff required a job that involved "very little social interaction." (Tr. 76.) The expert responded that there were a significant number of such jobs. (Tr. 76.)

the existence and degree of any ailment was supported by substantial evidence, the ALJ was only required to fairly describe those relatively minor limitations when questioning the vocational expert. *See, e.g., Long v. Chater,* 108 F.3d 185, 188 (8th Cir.1997) ("[T]he Commissioner may pose hypothetical questions to the vocational expert, the parameters of which do not have to include any alleged impairments that the ALJ has rejected as untrue.") The ALJ followed this rule, and, as a consequence, there was no error.

### B. Request to Reopen

■ Plaintiff originally alleged an onset date of December 28, 1996, but his lawyer amended the onset date to November, 1998. (Tr. 41–42.) She then added that "it requires the reopening of his prior application in Ohio." (Tr. 41.) As indicated earlier, the ALJ did consider evidence from the earlier application to the extent it provided medical history relevant to the later claim. However, the ALJ did not respond to counsel's suggestion that the earlier application be reopened. Nor did the ALJ's decision purport to determine the merits of the earlier application.

In a brief submitted to this court, Plaintiff requests that the earlier "Ohio application be re-opened." Pl.'s Br. in Supp. of Pl.'s Mot. for Summ. J. at 3. I deny Plaintiff's request.

My jurisdiction to review this case is limited. *See* 42 U.S.C. § 405(g). Section 405(g) does not give me the authority to "reopen" an earlier Ohio application in the course of deciding an appeal of a later Nebraska decision unless the earlier claim was considered on the merits in the later case. *King v. Chater,* 90 F.3d 323, 325 (8th Cir.1996) ("Absent a colorable constitutional challenge, federal courts generally do not have jurisdiction to review refusals to reopen claims for disability benefits. However, there is an exception to this general rule: where a claim has been re-

considered on the merits, it is properly treated as having been reopened as a matter of administrative discretion. Consequently, the decision is subject to judicial review to the extent it has been reopened.") (Citations omitted.)

In this case, although the ALJ considered evidence from the earlier application when deciding whether to grant the later application, there is no indication that the ALJ considered the earlier claim on the merits. The ALJ's consideration of evidence from an earlier application regarding whether to grant benefits on a later application does not amount to reopening. *Id.* (The consideration of medical evidence dating back to 1985 in connection with a 1992 application did not amount to a reopening of a 1987 application so as to confer jurisdiction on the court to review the earlier application.) As a result, I lack jurisdiction to grant Plaintiff's request.

### III. CONCLUSION

While I have empathy for Plaintiff, and respect for his committed counsel, the ALJ did not err. The Social Security Act was never intended to support unfortunates such as Plaintiff who, although not able to function well in society, do not suffer from a serious medical or mental illness. Accordingly,

IT IS ORDERED that Plaintiff's motion for summary judgment (filing 17) is denied, Plaintiff's request to reopen the Ohio application is denied, and judgment will be entered for the defendant and against Plaintiff, by separate document, denying the appeal of the Nebraska decision.