# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3527

_____

Evelyn Clay,                                    *
                                                *
      Plaintiff - Appellant,         *
                                                *   Appeal from the United States
    v.                              *   District Court for the Eastern
                                                *   District of Arkansas.
Jo Anne B. Barnhart, Commissioner,              *
Social Security Administration,                 *
                                                *
      Defendant - Appellee.          *

_____

Submitted: **May 13, 2005**
Filed: August 9, 2005

_____

Before **LOKEN, Chief Judge, HANSEN and MELLOY, Circuit Judges.**

_____

MELLOY, Circuit Judge.

The district court[1] affirmed the Commissioner's denial of Ms. Clay's claim for social security disability benefits. On appeal, Ms. Clay argues that her physical and mental impairments, taken together, meet Listing 12.05(C) for mental retardation.

_____

[1]The Honorable H. David Young, United States Magistrate Judge for the Eastern District of Arkansas.

<u>See</u> 20 C.F.R. Pt. 404, Subpt. P., App. 1 (2001).  She argues in the alternative that the administrative law judge ("ALJ") erred when he found that she could perform available jobs.  We affirm.

I.

Ms. Clay applied for social security disability benefits on March 31, 1992, alleging disability due to pain and limited mobility in her left knee and right arm.  She also alleged poor hearing and a humming in her ear.  The present appeal follows her fifth administrative hearing on the 1992 application.  The first four hearings on her application resulted in two remand orders from the Appeals Council and two remand orders from the district court.  During the protracted pendency of her application, she was subjected to repeated physical and mental examinations.  Accordingly, in her latest hearing, on September 24, 2001, extensive evidence was available.  The record before us includes information from multiple hearings as well as a large, cumulative body of medical evidence.

Her medical history, prior to her application, included surgery in the late 1970's due to an infection in her right ear; a gunshot wound and related surgery on her right arm in the early 1980's; and a 1986 left knee fracture followed by surgery.  She has a plate and pin in her left knee.  She claims to have re-injured her knee in 1989.  Her current complaints of left knee, right arm, and right ear defects and/or pain are all claimed as residual effects of these prior events.  She claims a disability onset date of sometime in the "1970's."

Ms. Clay did not initially claim mental retardation as a source of disability, and the record contains no reference to IQ testing or mental retardation before the date of her application for benefits.  She dropped out of school in the ninth grade and received poor grades prior to that time.  She claims that she was seen in 1975 by a psychiatrist in Blytheville, Arkansas, for problems related to the fact that she would

"fly off the handle." There is no suggestion that this earlier visit involved evaluation for, or diagnosis of, mental retardation.

On May 14, 1992, a consultative physician, Dr. James P. Russell, examined Ms. Clay. He noted that she reported that her left knee swelled occasionally, and that she had pain from the prior knee fracture and gunshot wound to the arm, but that she did not have intermittent pain caused by walking or standing. He reported that she could hear normal conversations. An audiogram showed that she had moderately severe hearing loss in her right ear and moderate to mild hearing loss in her left ear. She exhibited normal ranges of motion in all joints other than her left knee, which was limited to 90 degrees compared to a normal range of motion of 135 degrees. He noted that this restricted range partially limited her ability to squat. He also noted that she could hold a pen and write and grip objects with her hands and that she denied having any mood related disorders or hallucinations. He concluded, "This lady could do work activities such as sitting, standing would be compromised by her left knee, walking would be compromised, carrying/handling objects would be compromised. She can hear; although, that is compromised as described above."

On October 31, 1992, she was treated and released at an emergency room for a crack cocaine overdose. This appears to have been an isolated incident as the record does not support an inference that she was a habitual user or addict. The emergency room doctor recommended that she enter a treatment program. She did not enter a treatment program.

On December 18, 1992, a consultative psychiatrist, Dr. Crupie, examined Ms. Clay at the request of the ALJ. The ALJ ordered the exam because Ms. Clay had claimed that she was seeing and hearing things. Dr. Crupie concluded that Ms. Clay suffered from no psychiatric illness or disorder and that the things she saw and heard were most likely night terrors or dreams. He set forth a clinical estimate that her IQ was eighty. He did not claim to have conducted a physical examination, but reported

-3-

that she claimed pain as her reason for not being able to work. In his report, under "diagnosis," he wrote "chronic pain syndrome involving left knee, right shoulder and upper arm." He also noted, "I feel that this patient is describing her situation and condition honestly. I do not think that she is consciously exaggerating or malingering." He rated her as unlimited/very good or good in all categories of mental or personality-related job skills other than "understand, remember and carry out complex job instructions" and "demonstrate reliability," for which he rated her as "fair" and "poor or none," respectively.

In June 1993, Ms. Clay's attorney sent her to another consultative psychiatrist for evaluation, Dr. Justin H. Adler. Dr. Adler noted Ms. Clay's physical condition, stating that she walked without difficulty, without limping, and without the aid of a supporting device. He also noted that she claimed that she occasionally took Tylenol for pain, but that she was not taking any prescription pain medication. Her chief complaint was bad nerves. Dr. Adler did not offer an opinion as to whether Ms. Clay exaggerated her mental infirmities. He diagnosed her as having "Conversion Hysterical Disorder manifested by subjective pain sensations in an individual of limited intellectual endowment." He concluded:

> I don't believe that Mrs. Clay is consciously exaggerating her discomforts. She actually believes that she has pains as the result of her knee surgery. There is however a lack of commensurate emotional response to her pains which suggests a psycho-pathological dissociative reaction (Hysterical Reaction)[.] Her limited intellect also may play a contributory role here. Her hallucinatory experiences are very vague and more suggestively due to her limited mentality also, a fact not uncommon in individuals of a lowered socio-economic status. The prognosis for substantial improvement is very doubtful.

On February 10, 1998, a consultative psychologist, Michael Inman, Ph.D., examined Ms. Clay. Dr. Inman stated that Ms. Clay was initially hostile, was resentful throughout her examination, and was "ostensibly complying with the

evaluation, though providing minimal effort." He stated that her minimal effort "was best exemplified on IQ testing, on Block Design Subtest, when she would discontinue the task even when considerable time remained." He found that her "[g]eneral fund of information was limited, but consistent with her general full scale IQ . . . [she] was able to successful[ly] perform simple calculations, including addition, subtraction, multiplication and division . . . [and] abstract reasoning was limited and quit[e] concrete, though again considered commensurate with her full scale IQ[.] Judgment and social reasoning were grossly intact."

Dr. Inman administered a Wechsler Adult Intelligence Scale-III test (IQ test) and found Ms. Clay's Verbal, Performance, and Full Scale IQ scores to be 65, 62, and 61, respectively. Although he noted that she exhibited minimal effort and discontinued tasks on the IQ test when there was still time left, he ultimately concluded that, "Present subtests [sic] results are considered a valid indication of Ms. Clay's intellectual abilities, which are within the higher range of mildly mentally retarded."

Dr. Inman administered other tests and determined that, regarding these other tests, Ms. Clay was consciously exaggerating her symptoms to secure benefits. Regarding results from an Minnesota Multiphasic Personality Inventory-2 test ("MMPI-2 test"), Dr. Inman stated, "Ms. Clay responded to the MMPI-2 items in an extremely exaggerated manner. . . . Moreover, she responded in a non-defense manner . . . suggesting that her pattern of excessive symptom checking was for the purpose of falsely claiming psychological problems. . . . One is left, therefore, with the conclusion that current results are from extreme and conscious exaggeration of her symptoms apparently secondary to attempts to secure benefits." He diagnosed Ms. Clay with somatization disorder, dependent personality traits, and chronic pain syndrome involving left knee, right shoulder, and right arm. He stated that malingering remained to be ruled out. He concluded, "There is considerable evidence that her responses are extremely exaggerated, based on objective evidence of an

extremely high F score on her MMPI-2 as well as my own subjective impressions throughout the evaluation. My clinical impression was that Ms. Clay was probably malingering though this is difficult to assess." He specifically noted, however, that "[d]espite Ms. Clay's extreme exaggeration of her physical symptoms, her intellectual abilities nevertheless fall within the mildly mentally retarded range."

On September 5, 2001, another consultative psychologist, Richard C. Maddock, Ph.D., examined Ms. Clay. Dr. Maddock described her as defensive, indifferent, disinterested, and only minimally cooperative. He administered a full battery of psychological tests. He could not score her MMPI-2 test because she skipped many items and "filled out columns on the answer sheet in straight-line fashion, ignoring the questions and their 'True-False' alternatives." He also administered the Wahler Physical Symptoms Inventory and concluded that her "results suggest a strong emotional component to her physical complaints and also suggest malingering."

Dr. Maddock also administered an IQ test. Ms. Clay received Verbal, Performance and Full Scale IQ scores of 61, 57, and 56, respectively. Dr. Maddock noted that these scores were lower than the scores found by Dr. Inman in 1998. He concluded that the scores he measured, as well as her earlier scores were not valid, stating, "Since malingering has been an issue with Ms. Clay since the beginning and was addressed at least one time by Dr. Inman when he tested her, the scores from 2/10/98 are probably not valid. This would mean that neither set of scores could be considered to be valid or reliable." In reaching this conclusion about Dr. Inman's scores, Dr. Maddock created a graph on which he plotted the scores he measured against the scores Dr. Maddock measured to demonstrate the decrease over three years' time. He concluded that the difference in scores supported the conclusion that both sets were unreliable.

Dr. Maddock also administered a Wide Range Achievement Test. He found that Ms. Clay's various raw scores on the Achievement Test equated to first grade or kindergarten levels of achievement. Because he found that she was malingering, however, he found the Achievement Test results to be invalid.

To test for malingering, Dr. Maddock conducted a "Computerized Assessment of Response Bias assessment (CARB)." Dr. Maddock concluded that the results of the CARB assessment verified malingering and resulted in scores that "could only be related to giving misleading responses." Dr. Maddock stated, "It is extremely unlikely that even an individual who has sustained a severe brain injury would perform this poorly in the absence of symptom exaggeration or malingering issues."

Dr. Maddock, like all the psychologists and psychiatrists who examined Ms. Clay, noted that she cared for herself, dressed appropriately, was understandable when she talked and was able to communicate effectively. He concluded, however, that "Ms. Clay has not been open and honest during this interview. There was extensive evidence of malingering and exaggeration of symptoms in order to establish eligibility for disability benefits."

On September 21, 2001, Dr. James T. Galyon, an orthopedist, examined Ms. Clay. He concluded that she could not rotate her right forearm/hand outwardly but that she could rotate the right forearm/hand inwardly (full pronation but zero degrees supination), and that the limitation would impact her ability to work. He concluded that she had a full range of motion in her other joints, including her left knee, and that her left knee was not disabling or limiting.

At Ms. Clay's fifth hearing, a vocational expert testified and answered hypothetical questions asked by the ALJ. The hypothetical questions involved progressively more restrictive combinations of impairments to determine what jobs would be available to someone with these different levels of impairment. The first

hypothetical involved a person who had mild to moderate pain that was mostly controlled with over-the-counter pain medicine and who had a residual functional capacity that included the ability to: lift or carry ten pounds frequently and up to twenty pounds occasionally; stand or walk about six hours in an eight-hour day, one to two hours without interruption; walk for two blocks without walking on uneven ground; sit with no limitation; and only occasionally balance, kneel, crouch, crawl, or stoop. In this first hypothetical, the ALJ also included a restriction regarding borderline intellect and issues related to depression by further restricting the person to perform only, "simple, unskilled work, level three or below [meaning] unskilled or semi-skilled level three or below . . . understand, remember, [and] follow simple, concrete instructions . . . drive . . . work with supervision, superficial contact with the public [and] coworkers . . . [and] can meet and agree to change." Based on these limitations, the vocational expert recommended cashier work, with 1.6 million jobs available nationally, 16,000 statewide, and 8500 in two local counties. The vocational expert also recommended work as a machine operator, with 157,000 jobs available nationally, 3100 state-wide, and , and 1000 in two local counties.

The ALJ then amended his hypothetical to include a further limitation with more restrictive pain so that the worker would only be able to stand or walk for four hours out of an eight hour day and only be able to perform work while sitting down. The vocational expert classified this hypothetical as unskilled work at sedentary exertional levels and recommended assembly work with 161,000 jobs available nationally, 2000 state-wide, and 500 in two local counties, respectively.

During her interviews with the mental health professionals and through testimony at her five hearings, Ms. Clay described her daily activities and work history. She had worked part time, for short periods of time as a food worker, waitress, dish washer, and machine operator. She cared for herself and, for a period of time, for her grandchild. Early in the extended application process, she reported that she performed various household chores, but later she claimed that her son or

daughter did most of the housework. She claimed to attend church regularly, socialize seldomly, and watch television most of the time.

Applying the five-step sequential analysis of 20 C.F.R. § 404.1520(a)-(g), the ALJ found that Ms. Clay had not engaged in substantial gainful activity since her alleged onset date. Although Ms. Clay had worked at a few part time jobs, the ALJ concluded that she had no relevant past work experience. He found that her impairments were severe, but alone or in combination, neither medically nor functionally equal to any listed impairment. The ALJ found that Ms. Clay was physically and mentally restricted in the manner that he described in his first hypothetical and that there were a significant number of jobs available nationally for someone with those restrictions. He specifically found that Ms. Clay had some physical limitations but that her extreme subjective complaints were not borne out by the evidence. Also, he found that, although she was a person of limited intellectual abilities, her mental diagnosis was malingering rather than mental retardation. Ultimately, he found her not disabled and denied her application for benefits.

The Appeals Council denied further review, making the ALJ's denial of benefits the Commissioner's final decision. The district court affirmed, finding the evidence sufficient to support the Commissioner's findings under the deferential standards applicable to the review of social security determinations.

II.

We review the district court's decision to uphold the denial of social security benefits de novo. Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000); Pettit v. Apfel, 218 F.3d 901, 902 (8th Cir. 2000). Our review of the Commissioner's decision, however, is deferential, and we do not substitute our own view of the evidence for that of the Commissioner. Id. Rather, we affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. Dixon v.

Barnhart, 353 F.3d 602, 604 (8th Cir. 2003); Grebenick v. Chater, 121 F.3d 1193, 1197-98 (8th Cir. 1997); Hall v. Chater, 109 F.3d 1255, 1258 (8th Cir. 1997). Substantial evidence is evidence that a reasonable mind would find adequate to support a decision, considering evidence that detracts from the Commissioner's decision as well as evidence that supports it. Cunningham, 222 F.3d at 500; Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion. Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998); Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996).

In evaluating claims for disability, we conduct a five step sequential evaluation: (1) is the claimant engaging in substantial gainful activity; (2) does the claimant have severe impairment(s); (3) does the impairment or combination of impairments meet or equal an impairment listed in the Listing of Impairments in Appendix 1, Subpart P, 20 C.F.R. Part 404; (4) does the impairment or combination of impairments prevent the claimant from doing past relevant work; and (5) does the impairment or combination of impairments prevent the claimant from performing any other work which exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)-(g). Here, Ms. Clay argues that, at the third step, the Commissioner erroneously found that she did not meet the listing for mental retardation. She also argues that the Commissioner erroneously found against her at the fifth step by mischaracterizing her residual functional capacity and by relying on inadequate responses from the vocational expert regarding available work.

The listing for mental retardation, Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P., App. 1 (2001), describes mental retardation as, "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." To show a sufficiently severe disorder under subsection (C) of Listing 12.05, an applicant must show "[a] valid verbal,

performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." We have emphasized in the past that IQ scores must be valid, that the Commissioner need not rely exclusively on IQ scores, and that the Commissioner may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole. Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998).

Here, Ms. Clay did not initially claim mental retardation and there is no evidence other than her poor performance in, and early exit from, school to suggest onset of an impairment before age 22. The absence of a record of treatment, diagnosis, or even inquiry into a mental impairment prior to applying for benefits weighs against finding there to be an impairment.

The first psychiatrist who examined Ms. Clay, Dr. Crupie in 1992, did not examine her to determine her IQ or to assess her for mental retardation. Rather, he examined her because she claimed to be seeing and hearing things. Dr. Crupie believed that Ms. Clay dealt honestly with him in all respects and did not falsely exaggerate any symptoms. He gave a clinical estimate that Ms. Clay's IQ was eighty and rated her as good or very good/unlimited in categories such as "follow work rules," "relate to co-workers," "deal with the public," "use judgment," "interact with supervisor(s)," "deal with work stresses," "function independently," "maintain attention/concentration," "understand, remember  and carry out detailed, but not complex job instructions," and "understand, remember and carry out simple job instructions." Dr. Crupie's opinion strongly supports the Commissioner's conclusion because there is no suggestion that Ms. Clay was malingering or feigning mental infirmity at the time of Dr. Crupie's examination. In this regard we note that "a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in the claimant's intellectual functioning." Muncy, 247 F.3d at 734. There

-11-

is no evidence of disease or trauma to explain a change in performance between 1992 and her later, 1998 and 2001 evaluations.

The next psychiatric examination was the 1993 examination by Dr. Adler. Ms. Clay's attorney sent her to Dr. Adler because she claimed to have "bad nerves." There is nothing in Dr. Adler's report to suggest that he or Ms. Clay's attorney believed Ms. Clay to be mentally retarded, although Dr. Adler clearly believed Ms. Clay to be a person of limited intellect. Like Dr. Crupie, Dr. Adler did not believe Ms. Clay to be malingering or consciously exaggerating her symptoms. He concluded that she genuinely believed she was in great physical pain and that this belief, like her belief that she was seeing things, was related to her limited intellectual abilities. We believe that Dr. Adler's opinion also strongly supports the Commissioner's findings because, again, in the absence of a suggestion of malingering, Ms. Clay did not exhibit limitations consistent with mental retardation.

The next exam occurred much later, in 1998. During this exam, Dr. Inman conducted an IQ test and found IQ scores that ranged from sixty-one to sixty-five. Dr. Inman specifically stated that Ms. Clay failed to make a serious effort in her testing, and he specifically cited a subpart of the IQ test as an example of her failure to make more than a minimal effort. He also noted that she exaggerated her physical complaints and falsely checked symptoms on a different test in a probable attempt to claim psychological problems and that malingering remained to be ruled out. Notwithstanding these comments, Dr. Inman referred to the IQ scores he obtained as valid. He also noted that Ms. Clay's abilities with simple calculations, her general fund of knowledge, and her abstract reasoning were considered commensurate with her full scale IQ. Accordingly, in Dr. Inman's opinion, Ms. Clay demonstrated abilities consistent with the low IQ scores he measured. He also noted, however, that her judgment and social reasoning were grossly intact.

Viewed in its entirety, we believe that Dr. Inman's opinion was equivocal and that it was not error for the ALJ to disregard his findings. Dr. Inman's conclusion that he obtained valid IQ scores is at odds with his specific claim that Ms. Clay failed to put forth a serious effort when taking the IQ test, at odds with Dr. Crupie's observations of Ms. Clay and estimate of her IQ, and at odds with Dr. Adler's assessment of Ms. Clay. Interpretation of Dr. Inman's findings was a factual matter clearly within the province of the ALJ's authority as a decisionmaker, and the equivocal nature of Dr. Inman's report left the ALJ free to disregard his conclusions. We held in Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995), that it is the ALJ's role to resolve conflicts in experts' opinions. We believe this rule holds true whether the conflicts are between experts or internal to one expert's opinion.

Three years later, Dr. Maddock found IQ scores that ranged from fifty-six to sixty-one. He was convinced, however, that Ms. Clay was malingering, and he declared that his own results were invalid. Dr. Maddock also opined that it was likely that the results Dr. Inman obtained were invalid. He based his opinion of Dr. Inman's results on the fact that Dr. Inman had stated that malingering remained to be ruled out. Accordingly, Dr. Maddock's opinion lends no support to Ms. Clay's application and casts further doubt upon the validity of Dr. Inman's findings.[2]

---

[2]Ms. Clay argues that Dr. Inman excluded Ms. Clay's IQ test scores from his statement of concern regarding malingering. She also argues that Dr. Maddock ignored the applicable margin of error when he compared the IQ test results that he and Dr. Inman obtained. We believe that Ms. Clay's arguments in this regard miss the mark. Dr. Inman's opinion was internally inconsistent, and the ALJ was justified in relying on Dr. Inman's comments about minimal effort rather than his conclusion that the test scores were valid. Also, Dr. Inman clearly had general concerns about malingering, even if he only stated that malingering remained to be ruled out, and even if his concerns focused on physical impairments. These concerns, verified by Dr. Maddock, cast suspicion on Ms. Clay's motivations, her credibility, and the validity of all of Dr. Maddock's and Dr. Inman's tests involving Ms. Clay.

This is not a case, as in <u>Muncy</u>, 247 F. 3d at 733-34, where the court is faced with a decision from the Commissioner that involved choosing between multiple valid IQ scores. Rather, in this case, there is substantial evidence to support the conclusion that Ms. Clay's demonstrated abilities were inconsistent with those expected from a person with an IQ below seventy. Further, of the two sets of IQ scores, one was invalid by the tester's own admission, and the other was sufficiently suspect that the Commissioner was entitled to disregard it notwithstanding the tester's opinion that the scores were valid. Even though it might be possible to conclude that Dr. Inman's test results were valid and that the record could support a finding that Ms. Clay meets Listing 12.05(C), there is substantial evidence to support the Commissioner's conclusions, and support for Ms. Clay's position is not so compelling that we may reverse the Commissioner's finding. <u>Dixon</u>, 353 F.3d at 604 ("'If, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision of the Commissioner.'" (quoting <u>Nguyen v. Chater</u>, 75 F.3d 429, 431 (8th Cir. 1996))).

Regarding Ms. Clay's arguments surrounding the hypothetical questions posed to the vocational expert, we find no reversible error. Ms. Clay's first argument, that the ALJ erred by omitting additional restrictions from the hypothetical questions, relies on the opinion of Dr. Inman. The ALJ concluded that additional restrictions were not supported by the evidence, and we find no error in the ALJ's determination. <u>See</u> <u>Roberts v. Heckler</u>, 783 F.2d 110, 112 (8th Cir. 1985) (noting that "the hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ").

In her second argument concerning the vocational expert, Ms. Clay claims that the conclusion she could work as a cashier is inconsistent with the hypothetical and inconsistent with the Dictionary of Occupational Titles' (1994) description of cashier. Here, the ALJ's hypothetical limited possible jobs to "simple unskilled work, level

three or below," to be performed by a person with the ability to "understand, remember, [and] follow simple, concrete instructions . . . [and have only] superficial contact with the public." The Dictionary of Occupational Titles (1994) ("DOT"), in fact, states that the general position of cashier requires "level three" intellectual abilities. On this point, the expert's opinion presents no conflict. The ALJ, however, set forth further restrictions (superficial contact with public, simple, concrete instructions) that are arguably inconsistent with level three functioning and arguably inconsistent with the DOT's definition of the job of cashier. Accordingly, Ms. Clay's argument concerning her ability to work as a cashier may have merit.

Even though this argument may have merit, it does not demonstrate that Ms. Clay is entitled to benefits. Cashier was not the only job the expert found Ms. Clay could perform. The expert also opined that, with even greater limitations, a significant number of jobs would be available in the areas of unskilled, sedentary assembly work. Because the evidence supports a finding that a significant number of jobs would be available even if we disregard cashier jobs, Ms. Clay's argument does not warrant reversal.

The judgment of the district court is affirmed.

———————————————